605 A.2d 1001

**Marshall James GREEN, Jr.**

v.

**STATE of Maryland.**

**No. 644, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 7, 1992.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, BISHOP and FISCHER, JJ.

FISCHER, Judge.

Appellant, Marshall James Green, Jr., appeals to this Court after having been convicted by a jury in Prince George's County of felony murder, robbery with a deadly weapon, attempted robbery, and two counts of use of a handgun in the commission of a felony (robbery). For the felony murder conviction, appellant was sentenced to life imprisonment with all but thirty years suspended, and for use of a handgun in the commission of a felony, he was sentenced to twenty years imprisonment. Ten years of the latter sentence was ordered to run consecutively to the sentence for murder and ten years was to run concurrently with the murder sentence. This resulted in a total sentence of forty years with the addition of five years of supervised probation upon release.

The only question presented by appellant is:

Did the trial judge err in refusing to suppress a statement made by appellant?

The instant case arises from a murder and robbery which occurred in Prince George's County on August 4, 1990. This matter came under police investigation on the same date when McGarrette Fowler, a victim of the robbery, directed an investigating police officer to the body of Victor Harris located in a wooded area situated behind a building at 2318 Brightseat Road in Prince George's County. The victim died from a bullet wound in his chest. The investigating officer testified that "located at the victim's right foot was a clear plastic bag containing several rocks of crack cocaine."

Fowler testified that he and the murder victim, Harris, travelled from New York to Prince George's County to engage in the drug trade. He stated that, when he arrived in Prince George's County, he contacted Charles Harris as a prospective purchaser of drugs. After a preliminary meeting at which a sample of the merchandise was given to Harris, the prospective purchasers indicated that they would purchase cocaine in the amount of $2500. The parties present at the sale were Fowler, Charles Harris, Victor Harris, and two individuals identified only by their first names, Jay and Mike. Fowler stated that as the money and drugs were exchanged a "shooter ran from behind an abandoned house and yelled, 'Freeze,' and took one shot." The shot referred to was the one which struck and killed Victor Harris. Fowler proceeded to Charles Harris' home, dialed 911 and notified the police. The police initiated an investigation which resulted in the issuance of a warrant for appellant's arrest. On April 7, 1990, the warrant was in the possession of Sergeant Arthur L. Collins of the Prince George's County Police Department.

On that date, appellant's mother brought appellant to Sergeant Collins' office. Appellant was then seventeen years of age. At 10:00 p.m., Detective Collins began an interview with appellant by advising appellant of his *Mi-*

*randa*[1] rights. The detective testified that he informed appellant of his rights by reading from a card. The form used contained the sentence, "I am willing to answer questions and I wish to make a statement." Appellant initialed the statement. In addition, appellant initialed a statement which read, "[N]o promises or inducements have been offered to me by anyone. I have not been threatened or intimidated by anyone, and I have not been forced to make a statement. My decision to make a statement is entirely free and voluntary." Appellant's statement, as read into evidence, was as follows:

> I was stand [sic] out in the hallway and a girl next door said Spud wants you, so we met up. He said he know, he know two dudes coming down from New York with some drugs. Do you know who had a gun? I said Jay might know, so Jay called Mike. He came with a gun. So Spud came back over and said the deal is ready to go down. The two dudes had already seen Mike and Jay so they needed somebody to stick them up. So everything went okay until he went to go, move, because Spud [said] they had a gun. So I was scared, and then the gun went off. I didn't mean to do it. I am sorry because I wouldn't want to dead [sic] over no drugs.

Subsequently, Detective Collins asked questions and typed both the questions and answers. One of those questions was as follows: "[W]hen you went in the woods and began the robbery, what happened?"

> Answer: Mike was giving the dude with the drugs the money. The dark-skinned one from New York was taking drugs out of a bag and giving them to Mike. I came up and told everybody to give it up. The one that got shot, he went to move. That's the one that Spud said had the gun. He went to move and I didn't know if he was going to reach for it or not and I just shot him. The gun just went off.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant moved to suppress the statement, and a hearing on the motion was conducted a few months prior to the trial. At the hearing, appellant testified as follows:

He (Detective Collins) said, 'Don't make it hard on yourself.' He was asking me what happened. I said I wasn't there, and he kept on asking me what happened, and he said he could make it hard and easy for me, and he said, 'If you don't tell me what happened I can get you the electric chair,' or 'You are never going to see your mother again.' I just broke down and started to make a statement.

Detective Collins specifically denied telling appellant that he could get the electric chair and would not see his mother again if he declined to make a statement. The detective said that he made no promises or threats to appellant.

There was one pertinent admission by Detective Collins. On cross-examination, Detective Collins testified as follows:

Q. You did discuss with him the seriousness of the charges in this case, is that correct?

A. No, sir. Not as I recall it.

Q. You don't?

A. The seriousness of it?

Q. Yes.

A. No, sir.

Q. You didn't advise him the charge was first degree murder?

A. I told him it was murder.

Q. Did you ever tell him that it could be a death penalty offense?

A. Not to my knowledge.

Q. But you could have?

A. I could have.

Appellant's position is that, since he set forth specific allegations pertaining to threats, the State must set forth "effective contradictions" constituting an "express rebuttal" of the allegations. *Lyter v. State,* 2 Md.App. 654, 657, 236 A.2d 432 (1968). Appellant further argues that the

failure to deny affirmatively such assertions is the functional equivalent of an admission. Detective Collins' acknowledgement that he "could have" discussed the death penalty with appellant is considered by appellant to be a tacit verification of the alleged threats.

The State avers that Detective Collins' acknowledgement that he "could have" mentioned the death penalty is of no legal consequence where appellant's testimony demonstrates that his statement was not the product of any such comment. Appellant testified that he made the statement because he was threatened with the electric chair and was told he could never see his mother again. The State argues that appellant did not assert that his statement was induced by the comment that the death penalty was involved.

It seems clear, however, from Detective Collins' detailed testimony, that appellant's statement was given subsequent to Detective Collins' remark that the matter was a death penalty case. It logically follows that, having been told the matter was a death penalty case, appellant would understand that he was subject to the death penalty.

The trial judge realized that, had Detective Collins threatened appellant with the electric chair, the statement was not voluntary. The trial judge, however, found that Detective Collins did not make the statements, pertaining to the electric chair, attributed to him by appellant. In point of fact, the trial judge stated that Detective Collins would not have referred to the electric chair, since the detective was well aware that the mode of execution used in Maryland is administration of lethal gas.

■ While the trial judge made no express finding either way with respect to whether Detective Collins told appellant that he faced the death penalty, it is implicit in his dialogue with counsel that he believed the statement was made. After asking appellant's counsel three times during the argument whether counsel believed that it is improper for the police to tell the defendant that the penalty could be death, the judge said, "I am just wondering if your argu-

ment is that it is improper for the police to even tell them that the possible penalty for this is death. I don't see anything wrong with that either, because when you charge someone with murder, I think you are entitled to tell them what the ultimate penalty could be." It is apparent that the judge decided that the detective's comment to appellant that this may be a death penalty case was harmless, because the detective was simply commenting upon the maximum penalty available. In so concluding, however, we believe the trial judge erred.

■ *McIntyre v. State*, 309 Md. 607, 526 A.2d 30 (1987), instructs that a trial judge, in deciding upon the admissibility of a juvenile's statement, must consider the totality of the circumstances. As noted earlier, appellant was seventeen years of age at the time of this occurrence. He was without counsel and was separated from his mother who had brought him to the police station. As a juvenile, he was not subject to the death penalty, since Md.Ann.Code art. 27, § 412(f) provides that a person under the age of eighteen at the time the murder is committed may not be sentenced to death.

In *United States v. Duvall*, 537 F.2d 15 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), the defendant had been arrested and charged with numerous counts of forgery and uttering. After the prosecutor told the defendant that he faced a penalty of 100 years in prison, the defendant gave a statement. Ruling that the statement should have been suppressed, the federal appeals court explained:

> Duvall testified that the Assistant U.S. Attorney had told him that the charges carried 'a possible sentence of a hundred years.' The Assistant 'couldn't say' that he hadn't. The judge assumed that the Assistant had said what Duvall claimed. The judge was concerned about this since although the remark was correct as a matter of multiplication because of the large number of counts, 'it only tells part of the story.' How small a part is indicated by the fact that, after clear proof of guilt, the judge

imposed a prison sentence on only one count. This was for three years, with execution of two years (later changed to two and half years) suspended. [Footnote omitted.] The prosecutor must have known, as the defendant did not, that no judge would impose—indeed that no prosecutor would seek—a sentence for the crimes here charged remotely approaching a hundred years, and that a hundred year sentence was not 'possible' in any real sense. Yet a defendant might fear at least that the prosecutor would ask for a very long sentence if he did not 'cooperate.' Such a remark by a prosecutor to an uncounseled defendant from whom he is seeking a waiver of Fifth Amendment rights calls for something more than an expression of judicial concern. The statement to the Assistant U.S. Attorney should have been suppressed.

*Duvall,* 537 F.2d at 25.

The case at bar is even more compelling. It is obvious that the threat of a death penalty would be terrifying, particularly to a minor. It is difficult to conceive of any other purpose to Detective Collins' actions in mentioning a possible death penalty to appellant other than to coerce him into cooperating. *See also United States v. Gomez,* 927 F.2d 1530, 1538 (11th Cir.1991) ("[E]mphasizing to the accused the possible harsh sentences and the benefits of cooperation will likely be interpreted by the accused as pressure to respond and 'come clean.' "); *United States v. Toney,* 579 F.Supp. 652, 657 (S.D.N.Y.), *aff'd, United States v. Perez,* 733 F.2d 1026 (2d Cir.1984) ("[I]t is inappropriate for the prosecution to mention the length of the possible sentence while interviewing an uncounseled defendant in order to induce the defendant's cooperation...."); *People v. Johnson,* 70 Cal.2d 469, 479, 74 Cal.Rptr. 889, 895, 450 P.2d 265, 271 (1969) (Where police informed a minor that he was accused of first-degree murder, that he faced the gas chamber, and that he should "tell the truth because no one would believe his denial," the court opined that such exhortations carried "the implication that by cooperating and telling what actually happened [the defendant] might not be

accused of or found guilty of first-degree murder (i.e. more lenient treatment by the court or jury).... It stretches the imagination to believe that [the defendant] knowingly and intelligently waived his right to be free from self-incrimination."). In *McIntyre*, 309 Md. at 618, 526 A.2d 30 (quoting *Miller v. State*, 251 Md. 362, 378, 247 A.2d 530 (1968)), the Court of Appeals stated, "We observed that the Supreme Court 'has emphasized that admissions of juveniles require special caution.'"

In *Lodowski v. State*, 307 Md. 233, 254, 513 A.2d 299 (1986), the Court of Appeals quoted the test for voluntariness as articulated in *State v. Hill*, 2 Md.App. 594, 601–602, 236 A.2d 27 (1967), by Judge Murphy, then Chief Judge of the Court of Special Appeals:

> '[T]he constitutional inquiry is not whether the conduct of [the authorities] was shocking, but whether [the accused's] confession was free and voluntary, *viz.*, whether it was extracted by any sort of threats, or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. Otherwise stated, the test of the admissibility of [a] confession is whether [the accused's] will was overborne at the time he confessed ...; or whether his confession was the product of a rational intellect and a free will ...; or whether his statement was "freely self-determined,".... So that ... the question is not whether the accused was frightened, but whether his disclosures to the officers were freely and voluntarily made at a time when he knew and understood what he was saying. (citations omitted)'

In accordance with *Duvall*, 537 F.2d at 25, incorrectly advising a minor that he may be subject to the death penalty constitutes "improper influence" to the extent that the minor's free will is overcome. In light of the circumstances, admission of appellant's statement could not be found to be harmless error. Accordingly, we must reverse the decision of the circuit court and remand the matter for a new trial.

JUDGMENT REVERSED.

CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL.

COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.