No. 95,095

STATE OF KANSAS, *Appellee*, v. MICHAEL D. WALKER, *Appellant*.

(153 P.3d 1257)

590

Opinion filed March 23, 2007.

*Carl F.A. Maughan*, of Maughan Hitchcock LC, of Wichita, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Michael Walker was convicted on retrial of first-degree felony murder and criminal discharge of a firearm at an occupied dwelling. The trial court imposed a life sentence on the felony-murder conviction, to be served consecutive to a 79-month sentence for the criminal discharge conviction.

Walker appeals, arguing: (1) the trial court erred in denying his motions to suppress all statements and evidence discovered as a result of the police officers' interrogation of him; (2) the trial court erred in denying his "Motion to Change Judge"; (3) the trial court improperly sentenced him for both felony murder and discharge of a firearm at an occupied dwelling; (4) the trial court erred by including his juvenile adjudications in the calculation of his criminal history; and (5) his sentence for criminal discharge of a weapon was illegal and the length of his sentence shows vindictiveness on the part of the judge.

We reject each of these arguments and affirm Walker's convictions and sentences.

## FACTS

Walker's convictions and sentences arose from a drive-by shooting in which 16-month-old Lexus Mathis was mortally shot in the abdomen as she slept on a couch in her family's living room. Three days after the shooting, Walker was interrogated by police regarding the shooting. After his admission that he had driven the vehicle from which shots were fired at the Mathis' home, Walker was charged with committing the crimes of felony murder and criminal discharge of a weapon. A jury convicted Walker as charged.

On direct appeal, this court reversed Walker's convictions after determining the trial court had improperly admitted into evidence statements made by Walker to police after Walker had clearly invoked his Fifth Amendment right to counsel during a custodial interrogation. *State v. Walker*, 276 Kan. 939, 80 P.3d 1132 (2003) (*Walker I*).

The case was remanded and Walker was tried a second time. He was again convicted of first-degree felony murder and criminal discharge of a firearm.

A detailed description of the facts related to the shooting and the investigation can be found in *State v. Lowe*, 276 Kan. 957, 80 P.3d 1156 (2003), in which this court affirmed the conviction of Walker's codefendant, Jermane Lowe. Highly summarized, the evidence at Walker's second trial established that Walker, Lowe, and others left a club at closing. The group dispersed in separate cars. While some of the group were driving around, another car approached and fired shots. In response, Lowe, Walker, and perhaps others decided to drive to the house of a rival gang member and fire gunshots at the home. One of these shots struck Lexus Mathis.

Substantial evidence linked Walker and Lowe to the drive-by shooting. Jendayi Maples told police she was talking to Walker on her cell phone around 3:50 a.m., the approximate time of the shooting. During the conversation she heard Walker talking to Lowe and heard Walker ask Lowe if he "got the Tec," a semiautomatic weapon. Maples heard "that's the house," a series of about nine gunshots, and a car speeding away. Then, the phone line went dead. Frightened, she immediately called Walker back on his cell phone. He assured her everything was fine but his ears were ringing from the shots. Cell phone records verified that the two were talking at the time Maples reported, which was also the time witnesses reported hearing the shots fired at the Mathis' home.

Also during the investigation, police found shell casings from three types of cartridges near the curb directly across from the house. The State argued to the jury that the location of the casings indicated that the car had come to a stop while shots were fired from three guns and then additional shots were fired while the car was moving away.

There was evidence that on the night of the shooting Lowe was driving a maroon 1989 Toyota Camry belonging to Scott Shaffer. When Walker returned the Camry to Shaffer, the windshield was damaged from projectiles and the trunk latch was broken. Shell casings were found in the car. Ballistics testing revealed that the casings found in the car were fired from the same gun as some of the shells found at the scene of the shooting. The State argued that the physical evidence of where the shell casings were located in the car supported a conclusion that the driver of the car had fired shots. Latent fingerprints in the car did not match Lowe's or Walker's.

In his defense, Walker presented the testimony of Lowe, who denied that Walker had been with him on the night of the shooting. Another witness testified that Lowe asked the witness to go with him. The witness described the car that Lowe was driving; the description did not match the description of the car which Walker had driven that night.

ISSUE 1: *Did the Trial Court Err in Denying the Defendant's Motions to Suppress All Statements and Evidence Discovered as a Result of the Police Interrogation?*

The police interrogation of Walker occurred at the Wichita Police Investigations Bureau. Walker came to the bureau voluntarily after hearing that police wanted to speak with him. Walker was advised of his *Miranda* rights, and Walker indicated that he understood and wished to waive those rights and speak to the police. He initialed and signed a *Miranda* waiver form. Several hours into the interview, Walker made inculpatory statements, admitting to driving the car involved in the shooting.

Sometime after making that statement, Walker said, "If I could talk to my grandma right now, I just need to talk to a lawyer, man— I can't wait till I go downstairs." In *Walker I*, this court held that the police were required to honor that request to speak to an attorney and should have stopped the interrogation. 276 Kan. at 953. Their failure to cease questioning required the suppression of all statements subsequent to Walker's request for counsel.

Upon retrial, the trial court followed the holding in *Walker I* by suppressing all statements made after Walker's request for counsel.

However, Walker sought a broader order of suppression, arguing his statements were not voluntary but rather were elicited through coercive tactics. He also argued that because the detectives continued questioning him after he asserted his right to counsel, all evidence discovered as a direct result of the interrogation should have been excluded as "fruit of the poisonous tree."

Based upon the trial court's ruling that the statement was voluntary, the State, over defense counsel's objection, introduced into evidence a single statement from Walker's police interrogation: his admission to being the driver of the vehicle involved in the shooting. The statement was admitted through the testimony of Sergeant Alex Robinson. On cross-examination, the sergeant acknowledged that during the interview Walker also said he was not the driver.

In his motion to suppress before the retrial, Walker argued the statement was not voluntary, his right to remain silent had been violated, and, based upon the ruling in *Walker I*, other evidence had to be suppressed under the "fruit of the poisonous tree" doctrine.

On appeal, Walker mentions the violation of his right to remain silent but does not cite to the record or brief the argument. An issue not briefed by the appellant is deemed waived or abandoned. *State v. Holmes*, 278 Kan. 603, 622, 102 P.3d 406 (2004). Walker does, however, argue the issues of voluntariness and the issue of whether evidence relating to Shaffer's car was fruit of the poisonous tree.

### Standard of Review

In reviewing the trial court's denial of a criminal defendant's motion to suppress statements, this court determines, without reweighing the evidence, whether the facts underlying the trial court's decision were supported by substantial competent evidence. The trial court's legal conclusion drawn from those facts is reviewed de novo. *State v. Rupnick*, 280 Kan. 720, 727, 740, 125 P.3d 541 (2005); see also *State v. Kirtdoll*, 281 Kan. 1138, 1144, 136 P.3d 417 (2006).

Substantial evidence is "evidence which possesses both relevance and substance and which furnishes a substantial basis of fact

from which the issues can reasonably be resolved. Stated another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *State v. Luna*, 271 Kan. 573, 574-75, 24 P.3d 125 (2001).

## *Voluntariness*

Walker takes issue with the police officers' interrogation techniques and the length of time he was kept in the interrogation room. See *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964) (coercion during an interrogation can be mental as well as physical). According to Walker, he was coerced in that he had little experience with interrogations, was isolated from outside help during this period of questioning, and was threatened by police.

The issue of voluntariness of the confession had been raised before Walker's first trial and was also raised on appeal in *Walker I*. After the *Jackson v. Denno* hearing in *Walker I*, the trial court made detailed findings on the record with regard to its conclusion that Walker's statements were voluntary. On appeal, the *Walker I* court did not reach the issue, leaving the question open for further argument and evidence. 276 Kan. at 953. On remand, no additional evidence was presented. Rather, the trial judge, who had presided over the first trial as well, considered the record from the evidentiary hearing on the initial motion to suppress. The trial court essentially referred to its ruling prior to *Walker I* as the "law of the case."

Considering the appellate argument in *Walker I*, this court summarized the evidence from the evidentiary hearing which served as the basis for the court's ruling, stating:

"The interview began at 9:15 a.m. with some general biographical questions. [Detective] Mumma advised Walker of his *Miranda* rights, and Walker indicated that he understood and wished to waive those rights and speak to the police. Walker initialed and signed a *Miranda* waiver form. Mumma stated that Walker had been questioned in previous criminal investigations and was well acquainted with the process, although Mumma had never personally read him a *Miranda* warning before.

"Mumma and Detective Gouge were initially with Walker for about 50 minutes, during which Walker denied any involvement with the shooting or any knowledge about what happened other than rumors. After the initial interview, Walker was left alone in the locked interview room for over an hour. Questioning was reinitiated after which Walker was again left alone in the interview room. Detectives again returned and, after some additional questioning, placed Walker under arrest and handcuffed Walker to the table in the interview room. The arrest occurred at 1:38 p.m., slightly more than 4 hours after the interview began. The detectives again left Walker alone. He started yelling and banging on the table, wanting someone to stay with him. Various officers came and went. Whenever he was left alone in the room, Walker would yell and bang on the table. At around 4:14 p.m., an officer shackled Walker's foot to the table. Except for escorted restroom breaks, Walker was in the same interview room until 10:10 p.m., almost 13 hours after the interview began. He was not allowed to talk to his father [who had brought him to the bureau and was in the reception area] or other family members.

"Over the 13 hours, 10 Wichita police officers had contact with Walker, at least 5 of whom asked questions related to the investigation: Mumma, Gouge, Espinoza, Robinson, and Landwehr. Various techniques were employed to encourage Walker to talk." 276 Kan. at 941-42.

The transcript of the interview is a part of the record before us.

In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Gonzalez*, 282 Kan. 73, 103, 145 P.3d 18 (2006). Although we have repeatedly indicated that there are a number of factors to be considered when determining if a statement was voluntary and we have often enumerated those factors, we have not always done so in a consistent manner. Compare *Gonzalez*, 282 Kan. at 103 (listing five factors for consideration) with *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 (2005) (listing four factors) with *State v. Nguyen*, 281 Kan. 702, 725, 133 P.3d 1259 (2006) (adding English fluency to list of four factors). Combining these considerations, the factors to be considered when determining if a statement is voluntary are: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the

outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.

Mental State. The defendant in this case did not present any evidence regarding his mental state and, other than pointing to his level of agitation as a sign of coercion, does not argue this factor.

Duration and Manner. Walker complains about the length of time he was interrogated. He was in the interview room for almost 13 hours; Walker confessed to involvement in the crime after about 8 hours. It was shortly after this statement that Walker asked for an attorney and the interview should have ended. As a result, the admissible portion of the interview lasted approximately 8 hours. Walker was given numerous restroom breaks, was given food and drinks, and was permitted to smoke.

Although the interrogation spanned a substantial period of time, we have found statements voluntary when similar lengths of time were involved. See *State v. Ackward*, 281 Kan. 2, 128 P.3d 382 (2006) (upholding statements as voluntary where defendant's interrogation lasted 8 or 9 hours).

Outside Contact. Next, Walker complains he was denied contact with the outside world. The trial court agreed, finding there was "no question about that." Walker contends he made 17 requests to contact family members about his arrest during the course of the police interrogation. He fails, however, to discuss or identify the specific instances of which he complains, and we cannot reconcile his count with the record. As the State acknowledges in its brief, the transcript of Walker's interrogation shows at least four instances, before invoking his right to counsel, where Walker requested to speak with a family member and was denied the opportunity to do so.

Toward the beginning of the interrogation, Walker asked to speak with his father who was in the waiting area at the bureau, and Detective Gouge told Walker he could not do so at that time. Then, just before Gouge left the interrogation room, Walker asked whether he could go sit in the waiting area and go talk to his father. After Gouge told Walker he would see if they could arrange for him to speak with his father, Walker expressed the fact that he did

not want to be alone in the interrogation room. Later, well after Walker had been arrested, he asked Detective Gouge if he could call his grandmother, and the detective did not permit this. In addition, Walker eventually asked Sergeant Robinson to speak with his grandmother about hiring an attorney. At other times, Walker asked whether police had talked to his father or called his grandmother; however, these inquiries were not requests for Walker to make contact.

While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation. It must be recognized that such communications can occur through intermediaries such as family members. In this case, police had told Walker they were talking to other witnesses, including Maples and Lowe, while they were talking to him. At one point, he asked what Lowe had said. When they refused to tell him, he immediately asked if he could speak to his father. The timing of the request suggests his motivation for seeking outside contact was to gather information and, in turn, explains the police officers' reluctance to grant his request.

Refusal of such a request is not per se coercive. And, in this case, neither the number of requests, the context in which they were made, nor the police officers' responses made Walker's inability to communicate coercive.

Age, Intellect, and Background. The evidence established that Walker was 20 years old and previously had been interrogated and *Mirandized* by officers. There was no evidence regarding Walker's intellect. The trial court found that Walker seemed to "fall in the average range of intelligence." We see nothing that makes us conclude otherwise. Indeed, a review of the interview transcript reveals Walker carried on intelligent conversations with the officers.

Fairness of the Officers. Most of Walker's arguments relate to the factor of fairness of the officers. He argues the police tactics were coercive because the police threatened him with harsher penalties if he did not cooperate. See *State v. McCarther*, 197 Kan. 279, Syl. ¶ 4, 416 P.2d 290 (1966) (confession inadmissible when

elicited by force or threats). The trial court found that law enforcement neither coerced Walker nor made him any promises.

To support his contention regarding police threats, Walker specifically cites a colloquy between Lieutenant Landwehr and Walker where they discussed Maples' allegations that she heard gunshots when she talked to Walker on his cell phone on the night of the incident:

"[Landwehr]: So, . . . what's the gunfire coming over that phone?

"[Defendant]: The bitch. I swear man, for all it could have been a f—ing song that was on the radio or something.

"[Landwehr]: *Wrong. You stick to that story and you can get out in about 45 to 50 years and you can still stick to that story.*

"[Defendant]: S—t! I'm gonna stick to it and never change.

"[Landwehr]: . . . but right now . . .

"[Defendant]: ..it. (pounding noise) take me (pounding noises) across (pounding noises) the (pounding noises) street (pounding noises) man.

"[Landwehr]: Sit down. . . if they . . .

"[Defendant]: I'm gonna . . .

"[Landwehr]: . . . *have to tell you again . . . then you're gonna get hurt . . . do you understand?*

"[Defendant]: Y'all gonna beat me up?

"[Landwehr]: I didn't say that. I said don't bang on the table. . . act like a man. You're under arrest.

"[Defendant]: For what?

"[Landwehr]: Murder. Do you understand that? You're under arrest for murder." (Emphasis added.)

In context, it is clear that the comment about being hurt was not a threat but, rather, concern that Walker would hurt himself. Clearly, though, as Walker argues, the statement regarding 45 to 50 years was a reference to the amount of time Walker could spend in prison. Walker further argues that another officer, Sergeant Robinson, coerced him into making an incriminating statement by threatening Walker with 50 years in prison. Robinson came to the interrogation room because Walker asked to talk to him several hours into the interview. Walker explained that he knew Robinson from when he was younger and Robinson "stay[ed] on my case." A review of the interrogation transcript shows it was Walker who first mentioned to Robinson that "they gonna give me 50." Robinson responded: "I don't know what they gonna do. That's not left

up to the Police, that's left up to the courts . . . and the jury." Then, in urging Walker to tell him what happened on the night of the shooting, Robinson made numerous statements like, "Mike, you can't go to jail for 50 years for [something] you didn't do," and, "You can't go to jail for 50 years . . . even 5 years . . . for [something] you didn't do."

Although Robinson periodically played on the fact that Walker was scared of going to jail for 50 years, he did indicate that the length of jail time would be decided by the courts. In fact, just before his inculpatory statement, Detective Robinson advised Walker: "[Y]ou know they [booking officers] gotta talk to the DA's office, I'm not here to promise you what they'll do, or what they can or can't do. I don't want to fill your head up with something that ain't gonna happen."

Walker also points to several instances in the interview where the possibility of the death penalty was raised. To support his argument that the statements regarding prison time and the death penalty were coercive, Walker cites *Green v. State*, 91 Md. App. 790, 605 A.2d 1001 (1992), where the Court of Special Appeals of Maryland held that officers improperly influenced the minor defendant and overcame his free will by incorrectly advising the defendant that he may be subject to the death penalty. 91 Md. App. at 798. *Green* is neither controlling nor persuasive authority under the facts of this case.

Unlike the defendant in *Green*, Walker was not a minor. He was 20 years old at the time of the interrogation. As for the mention of the death penalty in this case, it was Walker who first broached the subject. After Walker admitted driving the vehicle involved in the crime, he asked Sergeant Robinson if Kansas has the death penalty. Robinson answered in the affirmative. Then Walker asked whether Robinson thought the shooter would get the death penalty. Robinson replied: "Yeah man . . . you need to get this stuff off of your chest." Later, Detective Mumma stated: "An aspect of the death penalty is if you kill a child under the age of 10. And obviously the child was killed." However, this discussion came after the statement used in the trial. Moreover, the references to the death penalty were made in the portions of the statement that were

suppressed, in other words, after Walker had requested an attorney.

Regardless, this court has declined to find a confession to be involuntary when the police encourage a defendant to tell the truth. *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Tillery*, 227 Kan. 342, 344, 606 P.2d 1031 (1980). This is true even where police have told a suspect he or she could be facing the death penalty in an attempt to get the accused to be truthful. *State v. Combs*, 280 Kan. 45, 51-52, 118 P.3d 1259 (2005).

Walker also complains about threats regarding what would happen if he did not cooperate. Walker argues these statements were deceptive. In *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005), this court cited *State v. Wakefield*, 267 Kan. 116, 128, 977 P.2d 941 (1999), for the controlling principle that "[d]eceptive interrogation techniques alone do not establish coercion."

The issue was also discussed in *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005). The *Swanigan* court stated: "[U]nder *Wakefield*, the false information must be viewed as a circumstance in conjunction with others, *e.g.*, additional police interrogation tactics." 279 Kan. at 32. In *Swanigan*, the interrogating officers urged Swanigan to confess to the crime so they could report that he cooperated. When Swanigan denied involvement in the crime, the interrogating officers threatened Swanigan with telling the district attorney that he had refused to cooperate and suggested that the district attorney would reject any deal for leniency. Moreover, the officers indicated that Swanigan could be charged with five robberies instead of one unless he confessed. This interrogation tactic involved an implied or express detriment if the defendant refused to cooperate, which the *Swanigan* court found may amount to suggesting to a suspect that his or her exercise of the constitutional right to remain silent could result in harsher treatment. 279 Kan. at 34-35. The court refused, however, to regard even that tactic as "one which makes the confession involuntary per se." 279 Kan. at 37.

The *Swanigan* court ultimately held that, under the circumstances, the repeated use of false information combined with Swanigan's low intelligence and susceptibility to being overcome by

anxiety, police threats, and promises constituted coercion that produced an involuntary statement. 279 Kan. at 39. In contrast to *Swanigan*, however, as we have previously discussed, there is no evidence that Walker had low intelligence and no testimony indicating that Walker was susceptible to being overcome by anxiety. The transcript shows that Walker became angry and agitated when left alone, but he carried on intelligent conversations with the officers. As previously discussed, the trial court found that Walker seemed to "fall in the average range of intelligence."

The complained-of statements regarding cooperation are similar to those made in *State v. Johnson*, 253 Kan. 75, 84, 853 P.2d 34 (1993). In that case, this court upheld a finding of voluntariness where a law enforcement officer stated he would go to the district attorney and tell him if the defendant was cooperating. The court found that the officer did not bargain with or promise Johnson anything either directly or by implication. 253 Kan. at 84; see also *State v. Harwick*, 220 Kan. 572, 575-76, 552 P.2d 987 (1976) (interviewing officer's mere offer to talk to district attorney did not render defendant's confession involuntary). Likewise, the officers' statements that Walker could help himself are similar to statements upheld in *State v. Ninci*, 262 Kan. 21, 39, 936 P.2d 1364 (1997) (interrogating officers told Ninci, "You can do some things to help yourself now.").

Therefore, we conclude that the officers' conduct was not of a nature to overcome Walker's free will and render the statements involuntary.

Fluency. No question was raised in this case regarding Walker's English fluency.

Conclusion. The trial court found that law enforcement was fair with Walker and that his statements were the product of Walker's free will. Substantial competent evidence supports the trial court's finding. Walker was comfortable with Sergeant Robinson, evidenced by the fact that he asked to talk to Robinson. Walker was experienced in dealing with law enforcement, as evidenced by some of his conversations with the officers in the interview room. Further, as Detective Mumma testified, Walker had been questioned on previous occasions.

As we have discussed, no individual factor, standing alone, suggests that Walker's free will was overcome. When we examine the totality of the factors and the circumstances of the interrogation as part of our de novo review, we conclude the statement was the product of Walker's free and independent will.

### Suppression of Vehicle

Walker further contends that the trial court erred in denying his motion to suppress physical evidence discovered as the fruit of a *Miranda* violation. Walker specifically argues that evidence pertaining to the vehicle should have been suppressed because statements given by Walker in violation of his right to counsel led law enforcement officers to locate the evidence.

The State argues the evidence should not be suppressed under the independent source test.

The exclusionary rule that prohibits the use of wrongfully obtained confessions also prohibits the use of any evidence obtained as a result of the wrongfully obtained statements under the fruit of the poisonous tree doctrine. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 64 L. Ed. 319, 40 S. Ct. 182 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") 251 U.S. at 392.

The evidence may be used, however, if police can trace the evidence to an independent and lawful source. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). As explained in *State v. Waddell*, 14 Kan. App. 2d 129, Syl. ¶ 4, 784 P.2d 381 (1989):

"Evidence obtained unlawfully in violation of a defendant's constitutional rights is admissible under the inevitable discovery exception to the exclusionary rule where the prosecution can prove by a preponderance of the evidence that the unlawfully obtained evidence would have ultimately or inevitably been discovered by lawful means."

Accord *State v. Ackward*, 281 Kan. 2, 18, 128 P.3d 382 (2006).

In this case, at the suppression hearing, the prosecutor acknowledged that after Walker requested counsel, he described the car

that was used in the crime and started telling officers about how he obtained the vehicle. Also, in the inadmissible portion of the interrogation, Walker provided law enforcement with the name "Scott" as the owner of the vehicle and the fact that the vehicle was maroon in color. But, officers' testimony revealed that Walker gave the wrong make of the car and the wrong location. The trial court ultimately found that the police used some information from the admissible portion of the interrogation, in conjunction with independent police investigation, to determine who owned the car, where it was located, and how Walker got the car on the night of the drive-by shooting.

Substantial competent evidence supports the trial court's conclusion that the prosecution established, by a preponderance of the evidence, that the unlawfully obtained evidence would have ultimately or inevitably been discovered by lawful means. Detective Reynolds testified that, during the admissible portion of the interview, Walker provided the police with the name of "Shawntell" Thomas as an alibi witness. Walker also mentioned that he and Thomas were in a car together on the night of the incident. Later, officers talked to Thomas who described the car as maroon in color.

Officers' testimony also revealed that Walker mentioned the names of Shaun Bell and Reginald Hunt during the admissible portion of the interview. Reynolds testified that, based on an address for a crack house provided by Walker during the inadmissible portion of the interview, the police went to Hunt's residence and talked to Hunt who admitted knowing Walker. It was a narcotics search warrant executed at Hunt's residence that led police to Scott Shaffer and his vehicle—the one that was used in the drive-by shooting. Regardless, Reynolds' testimony also indicated that, even if Walker had not given Hunt's address and the name "Scott" during the inadmissible portion of the interrogation, officers would have gone to the house to interview Hunt because Walker and Lowe had been there on the night of the drive-by shooting incident. Walker mentioned he had been at Hunt's house before he requested counsel.

The record shows that, while officers used evidence from both the admissible and inadmissible portions of Walker's interrogation

to investigate further into the details of the case, none of the statements made by Walker in the inadmissible portion of the interrogation led officers directly to the car used in the incident. The car was located only after law enforcement followed other leads, conducted interviews of other witnesses, and assimilated independent information.

The trial court correctly denied Walker's motion to suppress the vehicle evidence.

ISSUE 2: *Did the Trial Court Err in Denying the Defendant's "Motion to Change Judge"?*

Walker next argues that the trial court erred in denying his "Motion to Change Judge," filed pursuant to K.S.A. 2006 Supp. 20-311d. Judge David W. Kennedy presided over Walker's first trial, and Walker wanted a different judge to preside over his second trial. He argues, therefore, that he was denied a fair trial when his motion to change judge was denied. Walker's contentions are not persuasive.

### Standard of Review

The standard of review for a claim of error relating to a motion for change of judge is set forth in *State v. Alderson*, 260 Kan. 445, Syl. ¶ 2, 922 P.2d 435 (1996), as follows:

"When a district court refuses to recuse itself from a trial upon the defendant's request, this court has promulgated a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated: (1) Did the trial judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial? (2) If the judge did have a duty to recuse and failed to do so, is there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?"

### Applicable Statute

K.S.A. 2006 Supp. 20-311d governs the procedure involving a party's request for a change of judge and provides a three-step process. First, the party files a motion without stating the grounds for the party's belief that the judge to whom the case is assigned cannot afford that party a fair trial. "The judge shall promptly hear

the motion informally upon reasonable notice to all parties who have appeared in the case." K.S.A 2006 Supp. 20-311d(a).

The second step depends upon whether the judge disqualified himself or herself. If disqualified, the chief judge of the district assigns the action to another judge. "If the judge refuses to disqualify the judge's self, the party seeking a change of judge may file the affidavit provided for in subsection (b)." K.S.A. 2006 Supp. 20-311d(a). The affidavit must be filed immediately and may allege any of the grounds specified in K.S.A. 2006 Supp. 20-311d(c).

If an affidavit is filed, under step three, "the chief judge shall at once determine, or refer the affidavit to another district judge for prompt determination of, the legal sufficiency of the affidavit." K.S.A. 2006 Supp. 20-311d(b). If the affidavit is found to be legally sufficient, the case is assigned to another judge.

K.S.A. 2006 Supp. 20-311d(c) provides that one of the grounds which may be alleged in an affidavit for change of judge is that the party believes the party cannot obtain a fair and impartial trial because of the "personal bias, prejudice or interest of the judge." K.S.A. 2006 Supp. 20-311d(c)(5). The "affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists." K.S.A. 2006 Supp. 20-311d(c)(5); see *Hulme v. Woleslagel,* 208 Kan. 385, 392, 493 P.2d 541 (1972). Where the allegations in the affidavit are speculations only, they do not reach the threshold necessary to sustain the motion. *State v. Goss,* 245 Kan. 189, 198, 777 P.2d 781 (1989).

Walker filed a motion pursuant to K.S.A. 2006 Supp. 20-311d(a) seeking the recusal of Judge David W. Kennedy. Judge Kennedy denied the motion. Walker proceeded to the next step of the procedure and filed an affidavit in support of his motion for change of judge.

In his affidavit in support of his motion for change of judge, Walker pointed out that, in the first trial, Judge Kennedy had denied his motion for acquittal at the close of the State's evidence and had also denied his motion for acquittal notwithstanding the verdict at the conclusion of the trial. These rulings, according to Walker, show that Judge Kennedy previously "found the defendant guilty in this case." In addition, Walker noted in his affidavit that

Judge Kennedy had initially denied a trial continuance requested by defense counsel Steven House in 2004 and had also removed House from the case on ineffective assistance of counsel grounds, only to reinstate him as defense counsel 2 weeks later. Finally, Walker's affidavit alleged that Judge Kennedy "intimated to the jury that defense counsel was lying" when House objected to the admission of certain cell phone billing records in the first trial and counsel asserted that he had not received copies of those records.

The chief judge of Kansas' Eighteenth Judicial District, Sedgwick County—at that time Judge Richard T. Ballinger—examined Walker's affidavit and held an informal hearing on the matter. At the hearing, the ineffective assistance of counsel issue was discussed. It was revealed that when defense counsel House had requested a trial continuance, he told Judge Kennedy that he would be ineffective if he did not receive a continuance. Judge Kennedy was not inclined to give a continuance and, thus, removed House from the case. However, at a subsequent hearing, Walker's new defense counsel expressed Walker's desire to be represented by House and apprised the court that he had spoken to House about July 12, 2004, as an "appropriate date" for trial. Judge Kennedy then issued an order reappointing House as defense counsel and setting July 12 as the date for the jury trial.

At the informal hearing on the motion for change of judge, the State argued that the situation was not one where the trial court believed defense counsel could not handle the case. Instead, defense counsel expressed that he could not be ready for trial on the date imposed by the court. The State pointed out that the trial date was ultimately continued.

As for Walker's allegation that Judge Kennedy implicated defense counsel as a liar in the presence of the jury, this issue was not discussed at the hearing. However, Walker attached to his affidavit the portion of the transcript in which defense counsel House told Judge Kennedy he had not received copies of certain cell phone billing records. When House made this statement, the judge replied: "I think you have. But that doesn't make any difference." This was the extent of the discussion on the matter.

Considering the allegations as a whole, Judge Ballinger found there were "no legal issues, . . . no personal involvement, [and no] financial involvement" with regard to Judge Kennedy's relationship with the case. He observed that defense counsel and Judge Kennedy disagreed on some rulings and events in the past, but Judge Ballinger found that those did not "rise to the level of being a legal reason where this Court has to . . . recuse Judge Kennedy from this case." Walker's motion for change of judge was denied.

On appeal, Walker contends this ruling was erroneous because he created reasonable doubt regarding the impartiality of Judge Kennedy.

Applying the first prong of our standard of review, we must determine "(1) Did the trial judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial?" *Alderson*, 260 Kan. 445, Syl. ¶ 2. The Kansas Code of Judicial Conduct states a judge has a duty to recuse himself or herself from a case "in which the judge's impartiality might reasonably be questioned, including . . . instances where . . . the judge has a personal bias or prejudice concerning a party." Rule 601A, Canon 3E(1)(a) (2006 Kan. Ct. R. Annot. 576-77). This court has clarified that a judge should disqualify himself or herself if the circumstances and facts of the case "create reasonable doubt concerning the judge's impartiality, *not* in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *State v. Logan*, 236 Kan. 79, 86, 689 P.2d 778 (1984).

As Judge Ballinger determined, Walker has failed to meet this standard.

Regardless, even if this court were to assume that Walker established the first part of the test, in order to establish a due process violation Walker must demonstrate actual bias or prejudice by the judge. The term "bias" refers to the judge's mental attitude toward a party in the lawsuit. *State v. Reed*, 282 Kan. 272, Syl. ¶ 3, 144 P.3d 677 (2006); *Alderson*, 260 Kan. at 454. Bias and prejudice exist if a judge harbors a "hostile feeling or spirit of ill will against one of the litigants, or undue friendship or favoritism toward one."

*State v. Foy*, 227 Kan. 405, 411, 607 P.2d 481 (1980); see *Reed* 282 Kan. at 277. "[T]he recital of previous rulings or decisions by the judge on legal issues . . . shall not be deemed legally sufficient for any belief that bias or prejudice exists." K.S.A. 2006 Supp. 20-311d(c)(5); *Smith v. Printup*, 262 Kan. 587, 608, 938 P.2d 1261 (1997).

Walker fails to point to anything in the record demonstrating that Judge Kennedy actually exhibited bias or prejudice at either of his trials. Therefore, we conclude the ruling on the motion to change judge did not create reversible error.

ISSUE 3: *Did the Trial Court Improperly Sentence Walker For Both Felony Murder and Discharge of a Firearm at an Occupied Dwelling?*

Walker next raises the issue of whether the trial court improperly sentenced him for both felony murder and discharge of a firearm at an occupied dwelling. He contends that his sentence violates his right against double jeopardy. This contention lacks merit.

*Standard of Review*

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and §10 of the Kansas Constitution Bill of Rights prohibit multiple punishments for a single offense. The issue of whether Walker's convictions violate double jeopardy is a question of law subject to unlimited review. See *State v. Reed*, 282 Kan. 272; *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Walker did not raise the double jeopardy issue below, but Kansas appellate courts may consider an issue for the first time on appeal to serve the ends of justice or prevent denial of fundamental rights. A double jeopardy issue implicates a "fundamental right of a defendant to a fair trial under the 5th and 14th Amendments to the Constitution of the United States." *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984) (addressing the double jeopardy issue as one of multiplicity and noting the reason for concern of multiplicity is because it implicates double jeopardy).

Walker notes that the State's theory of felony murder arose from the death of 16-month-old Lexus Mathis as a result of shots fired

at the Mathis' house. He further notes that the charge of criminal discharge of a weapon at an occupied dwelling arose from the act of firing shots at the same house. Walker argues that only one wrongful act, the discharge of the weapon toward the house, involved a single act of violence. Thus, Walker contends that a single act of violence could not be used to support both crimes.

In making this single-act-of-violence argument, Walker relies on *State v. Groves*, 278 Kan. 302, 95 P.3d 95 (2004), and its progeny, in which this court recognized the single act of violence paradigm. However, in *State v. Schoonover*, 281 Kan. 453, 493-95, 133 P.3d 48 (2006), this court recently rejected this multiplicty paradigm as a corruption of early multiplicity jurisprudence and overruled *Groves*.

In *Schoonover*, this court recognized that the Double Jeopardy Clauses of the United States and Kansas Constitutions guarantee only the right not to be twice put in jeopardy for the same offense. The provisions permit a prosecution based upon the same acts but for different crimes if the legislature authorized the cumulative punishment. 281 Kan. at 465. Citing to United States Supreme Court precedent, the *Schoonover* court held that "if the legislature has explicitly authorized multiple punishment, the judicial inquiry is at an end; multiple punishment is authorized and proper." 281 Kan. at 468. The *Schoonover* court explained that when a double jeopardy claim arises from cumulative punishments imposed in one case,

"the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496.

The court listed four nonexclusive factors to consider in determining whether convictions arise out of the same conduct:

"(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. 453, Syl. ¶ 16.

If the convictions are based on discrete conduct, *i.e.*, committed separately and severally, there is no double jeopardy violation and the double jeopardy analysis ends. If the conduct is unitary, that is it arises from the same conduct, the court must consider whether by statutory definition there are two offenses or only one. 281 Kan. at 496.

In the case at hand, the first-degree felony murder conviction and conviction of discharge of a firearm at an occupied dwelling arose out of the same conduct of firing shots at the Mathis' home. The offenses were committed at the same time and at the same location. Moreover, there was no evidence of intervening events or a fresh criminal impulse motivating the conduct. Therefore, this constituted one transaction.

This leads the analysis into the second step, determining whether by statutory definition there are two offenses or only one. The *Schoonover* court explained that courts must discern whether the legislature authorized the multiple punishments. As an aid to making this determination when the convictions are based on the same conduct, the court usually applies the same-elements test. Under the same-elements test, a court may examine whether the charges in the complaint or information under different statutes requires proof of an element not necessary to prove the other offense. If so, the charges stemming from a single act do not violate the Double Jeopardy Clause. 281 Kan. at 495.

In this case, a same-elements test reveals that each offense required proof of an element not necessary to prove the other offense. The firearm offense requires proof that the defendant discharged a firearm at an occupied dwelling, while felony murder requires proof that a person was killed during the commission of an inherently dangerous felony. Compare K.S.A. 21-3401(b) with K.S.A. 2006 Supp. 21-4219(b).

Moreover, the *Schoonover* court also recognized that it may not always be necessary to apply the same-elements test; there may be circumstances where the legislature's intent is otherwise clear. The court cited to and discussed the United States Supreme Court's decision in *Missouri v. Hunter*, 459 U.S. 359, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983), in which a double jeopardy issue arose under

Missouri's felony-murder statute. In *Hunter*, the Court explained that the elements test is a rule of statutory construction and

"is not a constitutional rule requiring courts to negate clearly expressed legislative intent. Thus far, we have utilized that rule only to limit a federal court's power to impose convictions and punishment when the will of Congress is not clear. Here, the Missouri Legislature [by enacting a felony-murder statute] has made its intent crystal clear. Legislatures, not courts, prescribe the scope of punishments." 459 U.S. at 368.

Discussing this analysis in light of Kansas' felony-murder statute, the *Schoonover* court stated:

"The Kansas Legislature authorized multiple punishments by enacting K.S.A. 21-3436. K.S.A. 2005 Supp. 21-3436 lists those felonies which shall 'be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of' the felony-murder provision and those which 'shall be deemed an inherently dangerous felony only when such felony is so distinct from the homicide alleged to be a violation of' the felony-murder provision. Through these provisions, the legislature stated its intent as to when cumulative punishments can be imposed." *Schoonover*, 281 Kan. at 490-91.

In other words, through K.S.A. 2006 Supp. 21-3436(a), the Kansas Legislature expressed an intent that felony murder and any inherently dangerous felony listed in K.S.A. 2006 Supp. 21-3436(a) are separate offenses for which cumulative punishments may be imposed.

K.S.A. 2006 Supp. 21-3436(a)(15) provides that any felony offense provided for in K.S.A. 21-4219 and amendments thereto "shall be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of" the felony-murder statute. K.S.A. 2006 Supp. 21-4219(b) makes discharge of a weapon at an occupied building a severity level 7 felony.

Therefore, whether we construe K.S.A. 2006 Supp. 21-3436(a) or apply the same-elements test as a rule of construction, the Kansas Legislature's intent is clear: felony murder and felony discharge of a weapon are intended to be separate offenses for which there can be cumulative punishments. Double jeopardy does not attach to convictions under the felony-murder statute, K.S.A. 21-3401(b), and felony discharge of a firearm at an occupied dwelling, K.S.A.

2006 Supp. 21-4219(b), even if the charges arise from the same conduct. Walker's sentences for those convictions are not multiplicitous and do not violate his right against double jeopardy.

Therefore, the trial court did not err by sentencing Walker for felony murder in addition to discharge of a firearm at an occupied dwelling.

ISSUE 4: *Did the Sentencing Court Err by Including the Defendant's Juvenile Adjudications in the Calculation of His Criminal History?*

Next, Walker contends for the first time on appeal that his two juvenile convictions should not have been included in determining his criminal history score. This issue is controlled by *State v. Hitt*, 273 Kan. 224, 234-36, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003), in which it was held that the use of prior juvenile adjudications in a defendant's criminal history does not violate his or her constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

The defendant cites no new case law and offers no new argument which might persuade this court to depart from its previously stated position. There is no reason to stray from precedent. Walker's argument fails.

ISSUE 5: *Is the Defendant's Sentence for Criminal Discharge of a Firearm Illegal and Does the Length of His Sentence Show Vindictiveness on the Part of the Sentencing Court?*

Finally, Walker argues that the trial court's imposition of his sentence for the criminal discharge of a firearm conviction under the Kansas Sentencing Guidelines Act (KSGA) was vindictive and illegal and, therefore, must be set aside. These contentions lack merit.

### Standard of Review

"Whenever a defendant is sentenced to a presumptive sentence and there is no claim of error in regard to crime severity level or criminal history, there is a strong legislative presumption that the sentence is not the result of partiality, prejudice, oppression, or corrupt motive." *State v. Starks*, 20 Kan. App. 2d 179, Syl. ¶ 9,

885 P.2d 387 (1994); see *State v. Scales*, 261 Kan. 734, 737, 933 P.2d 737 (1997).

Whether a criminal sentence is illegal is a question of law over which an appellate court may properly exercise de novo review. See *State v. Harper*, 275 Kan. 888, 889, 69 P.3d 1105 (2003).

K.S.A. 21-4721(e) provides:

"In any appeal, the appellate court may review a claim that:

"(1) A sentence that departs from the presumptive sentence resulted from partiality, prejudice, oppression or corrupt motive;

"(2) the sentencing court erred in either including or excluding recognition of a prior conviction or juvenile adjudication for criminal history scoring purposes; or

"(3) the sentencing court erred in ranking the crime severity level of the current crime or in determining the appropriate classification of a prior conviction or juvenile adjudication for criminal history purposes."

Here, Walker complains that his original sentence for discharge of a firearm, a level 3 nonperson felony, was less than the sentence he received for the same conviction on resentencing. The sentence with which Walker takes issue is a presumptive sentence, but he contends that the sentencing court erred in ranking the primary crime for purposes of calculating the base sentence, which appears to fall under K.S.A. 21-4721(e)(3). Therefore, we have jurisdiction to consider the legality of Walker's sentence.

As for his contention that the sentence imposed on resentencing was illegal, Walker notes that, at his original sentencing, the court considered the felony-murder conviction to be the primary crime. As a result, the court essentially applied a criminal history score of "I" to calculate Walker's sentence for the criminal discharge of a firearm conviction. The applicable grid box contained a sentencing range of 55-59-61. See K.S.A. 2006 Supp. 21-4704. The trial court imposed a sentence of 61 months' imprisonment.

After Walker was retried, the trial court held a second sentencing hearing at which the court found that the criminal history score was calculated incorrectly at Walker's first sentencing hearing. At resentencing, the trial court calculated Walker's sentence using the criminal discharge of a firearm conviction as the primary crime. Applying a criminal history score of "F," the court imposed a mid-

range sentence of 79 months' imprisonment for the criminal discharge offense. The applicable grid box contained a sentencing range of 74-79-83. See K.S.A. 2006 Supp. 21-4704.

Walker argues that his sentence is illegal in that the trial court should have calculated his base sentence using the felony-murder conviction as the primary crime.

The plain language of K.S.A. 2006 Supp. 21-4720(b)(2) states, in pertinent part, that "[t]he sentencing judge must establish a base sentence for the primary crime. The primary crime is the crime with the highest crime severity ranking. An off-grid crime shall not be used as the primary crime in determining the base sentence when imposing multiple sentences." Felony murder is an off-grid crime.

K.S.A. 21-4720(b)(5) provides that "[n]onbase sentences will not have criminal history scores applied, as calculated in the criminal history I column of the grid, but base sentences will have the full criminal history score assigned." Because felony murder cannot be the primary crime under the KSGA, criminal discharge of a firearm at an occupied dwelling becomes the primary crime and the full criminal history score is assigned to the corresponding base sentence. Accordingly, the trial court correctly calculated Walker's sentence and it is not illegal.

As for Walker's contention that the "increase" in his sentence showed vindictiveness on the part of the sentencing judge, this argument also fails. Walker received a correct, legal, presumptive sentence at his second sentencing hearing. K.S.A. 21-4721(e)(1) permits appellate courts to review claims of partiality, prejudice, oppression, or corrupt motive where the sentence "departs from the presumptive sentence." No departure sentence was imposed in this case.

Walker relies on *North Carolina v. Pearce*, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969), and *State v. Rinck*, 260 Kan. 634, 638-40, 923 P.2d 67 (1996), to argue that judicial vindictiveness is presumed because he received a greater penalty at resentencing. *Pearce* "involved two separate cases where the defendants successfully appealed their original convictions and on retrial received greater sentences than they had received originally." 260

Kan. at 637. The *Pearce* Court noted that due process prevents increased sentences actually motivated by vindictive retaliation by the trial court upon resentencing:

"In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal." 395 *U.S.* at 726.

In *Rinck*, this court set aside the defendant's sentences on appeal and remanded the matter for resentencing. Upon resentencing, based upon the same two convictions, the defendant received a more severe sentence than the sentence originally imposed. 260 Kan. at 638. Relying on *Pearce*, this court determined that, where resentencing results in seemingly unjustified enhancement of sentences, there is a presumption of vindictiveness. 260 Kan. at 640-41. Where such a presumption applies, the sentencing judge or the prosecutor must rebut the presumption that the increased sentence resulted from actual vindictiveness. 260 Kan. at 642. The rebuttal did not occur in *Pearce*, and this court held that the defendant's due process rights were violated. The increased sentence was deemed to be motivated by vindictiveness and was set aside. 260 Kan. at 645.

In the present case, the sentencing court explained on the record that Walker's original sentence was calculated incorrectly. It was determined that the criminal discharge offense should have been assigned a criminal history score of "F" instead of "I," which changed the presumptive range on the sentencing grid. Thus, any possible presumption of vindictiveness was completely dissuaded by the court's clear and sound explanation.

The trial court's imposition of Walker's sentence for the criminal discharge of a firearm conviction under the KSGA was neither vindictive nor illegal.

Affirmed.