IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
May 28, 2025 Session Heard at Cookeville[1]

**STATE OF TENNESSEE v. ANTONIO DEMETRIUS ADKISSON A/K/A ANTONIO DEMETRIUS TURNER JR.**

**Appeal by Permission from the Court of Criminal Appeals
Circuit Court for Gibson County
No. 19840     Clayburn Peeples, Judge**

_____

**No. W2022-01009-SC-R11-CD**

_____

Seventeen-year-old Antonio Demetrius Adkisson (a.k.a. Antonio Demetrius Turner, Jr.) ("the Defendant") was charged with two counts of first-degree murder for the fatal shooting of two victims. The Gibson County Juvenile Court ("the juvenile court") held a transfer hearing and found it appropriate to transfer the Defendant to the Gibson County Circuit Court ("the trial court") to be prosecuted as an adult. After a jury trial, during which the Defendant's videotaped statements were admitted into evidence, the Defendant was convicted of two counts of the lesser-included offense of second-degree murder. On direct appeal, the Court of Criminal Appeals affirmed. See State v. Adkisson, No. W2022-01009-CCA-R3-CD, 2024 WL 1252173 (Tenn. Crim. App. Mar. 25, 2024), perm. app. granted, (Tenn. Aug. 14, 2024). The Defendant requested permission to appeal to this Court, alleging (1) the juvenile court lacked probable cause to believe he committed the charged offenses, as required for transfer by Tennessee Code Annotated section 37-1-134(a)(4)(A), and (2) the trial court erred in admitting his confession at trial because he did not validly waive his right to remain silent and his confession was involuntary. We hold that the Defendant was properly transferred to the trial court. We further hold that the Defendant validly waived his Fifth Amendment right to remain silent, but his confession was unlawfully coerced in violation of the Due Process Clause and thus inadmissible at trial. Having found reversible error on that basis, we vacate the Defendant's convictions of second-degree murder and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part, Reversed in Part; Case Remanded to the Circuit Court**

---

[1] Oral Argument was heard in this case on the campus of Tennessee Technological University as part of the Tennessee American Legion Boys State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

J<span>EFFREY</span> S. B<span>IVINS</span>, C.J., delivered the opinion of the Court, in which H<span>OLLY</span> K<span>IRBY</span>, D<span>WIGHT</span> E. T<span>ARWATER</span> and M<span>ARY</span> L. W<span>AGNER</span>, JJ., joined. S<span>ARAH</span> K. C<span>AMPBELL</span>, J., filed a separate opinion concurring in part and dissenting in part.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Antonio Demetrius Adkisson.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; Ronald L. Coleman, Senior Assistant Attorney General; Frederick H. Agee, District Attorney General; and Hillary L. Parham, Assistant District Attorney General, for the appellee, State of Tennessee.

Jason Gichner and Jessica Marie Van Dyke, and Lauren Gottesman, for the Amici Curiae, The Tennessee Innocence Project and The Innocence Project.

Jonathan P. Harwell, Sean P. Day, and Martha Dinwiddie, for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

*The Shooting and Subsequent Investigation*

The Defendant's convictions arose from the murder of Dearrious[2] Young and Troy Whitmore ("the victims"). At approximately 9:00 p.m. on September 26, 2017, the victims were fatally shot at the Meadows apartment complex ("the Meadows") in Milan, Tennessee.

Officer Dexter Huddleston of the Milan Police Department was off duty on the night in question and heard the gunshots as he was leaving his apartment near the Meadows. He immediately retrieved his weapon for protection and drove to the scene in his patrol car. As he was pulling up to the Meadows, he saw a group of people[3] standing over two individuals on the ground. Officer Huddleston radioed the Milan Police Department dispatch and requested two ambulances. Upon exiting his patrol car, Officer Huddleston discovered the victims lying on the sidewalk with gunshot wounds. Each victim had been shot four times. Officer Huddleston saw no weapons on or around the victims' bodies. One

---

[2] We note that, in the grand jury indictment, Mr. Young's first name is spelled "De'Airrious". For consistency, we use the spelling reflected in the Court of Criminal Appeals' opinion below.

[3] Officer Huddleston testified at the Defendant's transfer hearing that he saw two people standing over the bodies. At trial, however, he stated that he saw a crowd of people.

of the victims, Dearrious Young, was deceased. The other victim, Troy Whitmore, was breathing but unresponsive. Thereafter, Whitmore was transported to Milan Hospital via ambulance, where he was pronounced dead.

Investigator Jason Williams and other on-duty police officers responded to the scene within minutes. Police "canvassed the whole area" for physical evidence using a metal detector and professional lighting equipment. Nevertheless, they recovered only three 10-millimeter shell casings and no weapons. In fact, no weapons associated with this case were ever recovered. Based on the ballistics evidence from the scene, police determined that two firearms were used in the shootings: a revolver, which would not eject spent shell casings, and some type of pistol that would eject spent shell casings.

While officers were investigating the scene, the Milan Police Department dispatcher received several anonymous, unverified tips identifying seventeen-year-old Antonio Demetrius Adkisson ("the Defendant") and seventeen-year-old Justice Walton ("the Co-Defendant") as the perpetrators. Onlookers at the scene also implored law enforcement officers to investigate the Defendant and the Co-Defendant. Based on this information, the police identified the Defendant and the Co-Defendant as suspects.

Police contacted the Defendant at his home later that same night at approximately 2:00 a.m. As shown by the body camera footage of the encounter, Milan Police Sergeant Joe Fountain and Officer Allen Alexander arrived first and began speaking to the Defendant on the front porch of his home with his mother standing behind him. The officers asked the Defendant where he had been that night, and the Defendant's mother advised him that he did not have to answer. Against his mother's advice, the Defendant responded that he had been at the Meadows around 7:00 p.m. Sergeant Fountain informed the Defendant that he was not under arrest and verbally informed him of his *Miranda* rights. When Sergeant Fountain asked the Defendant if he understood his rights, the Defendant nodded affirmatively.

Investigator Williams arrived a short time later. He asked the Defendant if he had seen the Co-Defendant, and the Defendant responded that he had been with him earlier. Investigator Williams told the Defendant's mother that he would like to speak with the Defendant at the police station and would bring him home when they were done. When the Defendant's mother asked if she could come, Investigator Williams replied that she was "more than welcome." Investigator Williams explained to the Defendant's mother that her son's name had come up alongside the Co-Defendant in connection with a double homicide.

The Defendant's stepfather, who had walked onto the porch during the encounter, noted that the Defendant was seventeen and asked the officers if the Defendant's mother would be able to sit in on the questioning. Investigator Williams assured him that she would. After again assuring the Defendant's mother that her son was not under arrest,

police transported the Defendant to the police station in the back of a marked patrol car. The Defendant's mother stated that she would be "right behind" them.

*The Interrogation*

At approximately 2:20 a.m., the Defendant arrived at the police station and was placed in an interrogation room. Prior to the interrogation, the Defendant sat by himself in the interrogation room with the door open. During this time, he made small talk with two officers standing in the hallway. The Defendant told the officers he was a senior at Milan High School and was taking classes like economics, Spanish II, and history. From the hallway, an officer stated, "This is Mother. She is welcome back." Another officer interjected, "Hold off on that. Hold up." Although she remained in the lobby of the police station, the Defendant's mother was never permitted to enter the interrogation room or speak to her son during the following seven hours.

At 2:30 a.m., Detective Nick Glenn, a Milan Police Department officer who was also the Defendant's school resource officer, entered the room and began to question the Defendant. The Defendant explained to Detective Glenn that he and the Co-Defendant had run into victim Dearrious Young while at the Meadows earlier that night around 7:00 p.m., that Young and his friends had flashed guns at them and threatened to beat them up, and that he left around 7:05 p.m. because he did not feel safe. The Defendant also told Detective Glenn that he was not around when the shootings occurred and he did not see anybody who got shot. Although the Defendant initially said he did not know the victims, he later admitted he had been in a prior altercation with Young.

Suspecting that the Defendant was lying, Investigator Williams entered the room and took over the interrogation at approximately 2:40 a.m. Investigator Wiliams began by noting that the Defendant already had been advised of his *Miranda* rights and asking the Defendant if he would like to go over them again. The Defendant shook his head negatively. Nevertheless, Investigator Williams once again clearly advised the Defendant of his *Miranda* rights. Thereafter, the following exchange occurred:

> [Investigator Williams:] Anything we discuss right now I can talk with the DA about in the future. Okay? I've had numerous phone calls. Okay? I've probably got enough to charge you with two counts of first-degree murder. Okay?
> [Defendant:] (nods affirmatively)
> [Investigator Williams:] But, first of all, before we get that far. I heard some of the conversation you had with Nick. I was in the next door over here doing some paperwork. And evidently you've had some beef with these guys. If you're scared of them or if they, you know if you was in fear for your life, or if you and [the Co-Defendant] was in fear for your lives . . . . Now, right now is the time to tell me the truth. Because if you don't . . . I don't know if you

realize how much trouble that ya'll [sic] are in. Okay? I mean, you're looking at possibly the death penalty. You understand what I'm saying?

[Defendant:] Yes sir.

[Investigator Williams:] But, if you'll be honest with me, I'll try to help you all I can. But if you're not, I can't help you. Okay? I mean, I can't, Garry Brown, the District Attorney in this area has already been on the phone, within the last 30 minutes. Okay? I mean, it's serious. And I feel like you'll be honest. But I just want to let you know how serious it is if you're not. It's serious either way, but you have to be honest, okay?

Investigator Williams later testified that he was unaware at the time of the Defendant's questioning that the law precludes the imposition of the death penalty on juvenile offenders. See Roper v. Simmons, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.").

Following the above exchange, the Defendant explained to Investigator Williams that he and the Co-Defendant walked to the Meadows before the shootings, a group flashed their guns at them near the dumpster area, and he split off from the Co-Defendant and left around 7:05 or 7:15 p.m. because he did not feel safe. He claimed that his father picked him up by the highway near the Meadows around that time and that he knew nothing of the shooting until he arrived home later that night.

To this, Investigator Williams replied "Well, I would believe that if I didn't see you [on] video. The Meadows has got video . . . pointing towards the shooting." In fact, no such video existed. Investigator Williams explained that he did not believe the Defendant was being "straight" with him and asked if he would be willing to take a polygraph test. Gesturing to the door, the Defendant replied, "Ask my mama." Investigator Williams retorted, "You would fail it." He explained that numerous callers had reported seeing him and the Co-Defendant on the scene.

At 2:52 a.m., Investigator Williams asked the Defendant who shot the victims if not him. The Defendant replied, "I don't know who shot . . . can you get my mamma in here?" Investigator Williams replied, "No, I'm not getting your mamma in here . . . I mean this is grown up shit." The Defendant reiterated that he was not present at the shooting and claimed that he was with his father. Investigator Williams told the Defendant that he was going to get his father's phone records to determine if they "pinged" at the location where the Defendant claimed his father picked him up. Investigator Williams stated, "When I prove . . . you ain't going nowhere. You gonna sit right there. And when I prove the first lie . . . the first lie that I catch you in I'm gonna charge you with two counts of first-degree murder. Okay? Now if you tell me what happened and tell me the damn truth, we can deal with that and you might not be up here all night long."

At 2:58 a.m., the Defendant recounted the evening again, but this time he admitted to being at the Meadows with the Co-Defendant at approximately 9:00 p.m. when the shooting took place. However, he insisted that he and the Co-Defendant had run away together after hearing gunshots in the distance. Investigator Williams again stated that he was not buying the Defendant's story.

The Defendant asked to start over. This time, he identified the Co-Defendant as the shooter. The Defendant claimed that he and the Co-Defendant had left the Meadows together after the encounter with Young, but that they returned later to retrieve the Co-Defendant's phone. He admitted he was "right there" when the Defendant pulled the trigger but denied having fired a weapon himself. The Defendant drew a diagram to show Investigator Wiliams the route he and the Co-Defendant took to flee the scene. Investigator Williams asked the Defendant if his hands would test positive for gunshot residue. The Defendant insisted they would not.

At 3:19 a.m., as Investigator Williams was getting up to leave, the Defendant asked, "Is my mama here?" Investigator Williams confirmed that she was at the station and told the Defendant that he was going to talk to her. The Defendant asked if he could speak to her too. Investigator Williams replied, "Yea. We'll let you talk to her in just a second." After Investigator Williams exited the room, the Defendant crossed his arms on the table in front of him and laid his head in his arms.

At 3:23 a.m., the Chief of Police, Bobby Sellers, entered the interrogation room. After Chief Sellers explained to the Defendant that he was the police chief, the following exchange occurred:

> [Chief Sellers:] . . . Do you understand how much trouble you're in?
> [Defendant:] Because I was with him when it happened?
> [Chief Sellers:] [nods affirmatively]
> [Defendant:] [nods affirmatively]
> [Chief Sellers:] You're just as guilty as he is.
> [Defendant:] I didn't know he was going to do it though.
> [Chief Sellers:] I understand. But do you think twelve men and
> women in a jury box are gonna believe that?
> [Defendant:] [shrugs his shoulders]

Chief Sellers asked the Defendant if he wanted to be in prison at age seventeen, clarifying that he was referring to the state penitentiary, not a juvenile detention center. He asked, "You know what they do to seventeen-year-olds in the [penitentiary]?" When the Defendant shook his head no, Chief Sellers said, "I don't think you want to know." The Defendant stated, "And [Investigator Williams] said I might get the death penalty." Chief Sellers replied, "I don't know about that. We don't know about that. But you're in a lot of damn trouble. What you've got to do right now is help yourself. Where is [the Co-

Defendant] at?" The Defendant said he did not know. Chief Sellers told the Defendant that when he ends up in court, how much he helped police will have a bearing on what happens to him. During the conversation, Chief Sellers positioned himself directly in front of the seated Defendant and leaned forward with his hands braced on the table.

Chief Sellers exited the room at 3:26 a.m. Thereafter, the Defendant tightly gripped his hair and began rocking back and forth in his chair, repeatedly whispering, "I'm gonna go to jail." He placed his head on the table in front of him and repeatedly hit it there. He appeared to cry for several minutes. He tried to sleep but could not get comfortable.

Investigator Williams returned 20 minutes later to resume questioning. The Defendant once again recounted the events of the prior night. Although he added additional details, he largely stuck to his most recent story. At 3:54 a.m., the Defendant told Investigator Williams what Chief Sellers had said about how he could get in trouble for being at the scene even though he was not the shooter and that a jury would not believe him innocent. Investigator Williams replied that, although he believed the Defendant was not the shooter, he was "on the verge of proving" that he was standing by the Co-Defendant when he pulled the trigger.

When the Defendant again insisted that he stayed back, Investigator Williams stated that this "show[ed] how cooperative" he was being. The Defendant asked if he was being good or bad at cooperating, and Investigator Williams stated that he was somewhere in the middle. He told the Defendant that if he wanted him to "whisper in [the district attorney's] ear" that the Defendant was cooperative, scared, remorseful, and just a kid, he needed to tell the truth.

At 4:03 a.m., as Investigator Williams was getting up to leave, the Defendant again asked if he could speak to his mother. Investigator Williams replied, "Yeah, I think they're talking to her. But we'll get her in a minute." When Investigator Williams left, the Defendant put his head down on the table. Approximately one minute later, an officer opened the door and asked the Defendant if he wanted a biscuit. The Defendant declined but asked for water, and officers brought him a bottle of water.

At 4:31 a.m., Investigator Williams re-entered the room, accompanied by Detective Kelvin Whitney of the Milan Police Department. The Defendant continued to claim that he was only nearby when the Co-Defendant fired the shots. He used the diagram he had drawn to explain the direction he ran in after the shootings. The officers left at 4:47 a.m. At approximately 5:00 a.m., an officer entered the interrogation room and asked the Defendant about the clothing he was wearing the night before and whether he needed more water. The Defendant was alone for the majority of the following three hours. He took two brief trips to the restroom but otherwise remained in the interrogation room alone.

At 6:02 a.m., the Defendant knocked on the door and asked, for a fourth time, if he could speak to his mother. Detective Whitney confirmed that she was still at the station and told the Defendant he could "talk to her in a minute." Around 6:40 a.m., the Defendant knocked on the door again and asked for a blanket or a towel because he was cold. An officer informed him that they did not have any. Approximately 15 minutes later, the Defendant knocked on the door again and asked to speak to Detective Whitney.

Detective Whitney reentered the interrogation room at 6:57 a.m. The Defendant told him that he did not want to "take the charge" for the Co-Defendant. Detective Whitney replied, "we don't want to charge you with something that you didn't do . . . that's why we're trying to work all this stuff out." The Defendant then told Detective Whitney that the Co-Defendant had two guns but denied having held either gun. He emphasized that he was willing to take a gunshot residue test and asked if he "ha[d] to stay here still" after taking it. Detective Whitney replied, "I don't know man. We're still trying to figure everything out."

At 7:02 a.m., Detective Whitney left the room. The Defendant put his head down on the table. He tried but failed to sleep. At 8:08 a.m., an officer brought him food from McDonald's, which the Defendant did not eat.

At 8:34 a.m., Detective Whitney returned. He explained that police were about to run a search warrant on the Defendant's home and stated, "We know you had a gun." Detective Whitney asked whether the Defendant shot out of fear or to kill somebody, and the Defendant confessed that he shot out of fear. The Defendant explained that the Co-Defendant gave him a revolver for protection after the initial encounter with Young and that he dropped the gun while running away from the scene. He claimed that, upon encountering Young again, someone had pulled out a gun and he had pulled the trigger because he "felt like it was [his] life or their life."

Detective Whitney ultimately left the room at 8:51 a.m. The Defendant sat alone in the interrogation room for the next 40 minutes. The recording of the interrogation ends at 9:38 a.m., with the Defendant alone in the interrogation room. Thereafter, the Defendant was arrested.

*Juvenile Court Proceedings*

The Defendant and the Co-Defendant were each subsequently charged with two counts of premeditated first-degree murder. The State filed notice of its intent to transfer both juveniles to the Gibson County Circuit Court to be tried as adults. Prior to the transfer hearing, the Defendant moved to suppress his incriminating statements made to investigators on September 27, 2017. [4]

---

[4] The Defendant's motion to suppress filed in the juvenile court is not in the record.

The juvenile court held a joint transfer hearing for the Defendant and the Co-Defendant on October 13, 2017. At the transfer hearing, Officer Huddleston testified that he was off duty on the night in question and was leaving his home near the Meadows around 9:10 p.m. when he heard four gunshots. He immediately drove to the Meadows in his patrol car. Although he activated his emergency blue lights, he forgot to turn on his headlights in his rush to get to the scene. When he pulled up to the scene, he observed "two people standing over two bodies." Because the area was poorly lit and he had failed to turn his headlights on, he could not clearly see the people standing over the bodies. By the time he exited the vehicle and approached the bodies, the people he had seen standing around them had disappeared. Officer Huddleston remained at the scene while it was being processed and did not see any weapons recovered from the victims' bodies.

Witness Quavion Lipscomb, cousin of the Defendant and classmate of the Defendant and the Co-Defendant, testified that he was with the Defendant and the Co-Defendant earlier on the night of the shootings. He testified that they came to his house between 6:00 and 6:30 p.m. A short time later, they asked Lipscomb if he wanted to smoke marijuana with them at the Meadows and another nearby apartment complex, the Villas. Lipscomb declined but agreed to drop them off. A couple of nights after the shootings, Lipscomb spoke to law enforcement officers and told them that the Co-Defendant's pants had been sagging and seemed unusually heavy. The Defendant's pants, on the other hand, were not sagging. Lipscomb drove the Defendant and the Co-Defendant to the Villas and dropped them off around 7:00 p.m. While in the car on the way to the Villas, Lipscomb saw a silver gun in the waistband of the Co-Defendant's shorts. He did not see the Defendant with a gun.

Witness J'Lon Dance, cousin of the Defendant and the Co-Defendant and friend of the victims, testified that his aunt picked him up from work at approximately 8:00 p.m. on the night of the shootings and dropped him off at the Meadows, where he lived with his mother. Upon arrival, Dance ran into Young and two other friends and began speaking to them outside of his apartment near a dumpster. Not long after, the Defendant and the Co-Defendant walked by. Before he and the Defendant walked away, the Co-Defendant said something unintelligible and "raised up his shirt" to show "something silver" that Dance thought was a gun. Thereafter, Dance and two friends went back to Dance's apartment to play video games. The victims joined them around 9:00 p.m. At some point thereafter, Dance walked the victims to the door, and they left the apartment. Moments after they left, Dance heard gunshots. Upon hearing shots fired, Dance and the others immediately ran outside and saw the victims on the ground. Dance testified that he did not see anyone else near the victims' bodies.

Witness Michael Williams testified that, on the night in question, he was preparing to go to his godbrother's home when he heard on a police scanner app that someone had been shot in the area. Approximately 10 to 15 minutes later, he drove to his godbrother's home located near the Meadows. After he pulled into the back driveway, but while he was

still sitting in his car, he observed two young men "speed-walking" through "the cut" behind his godbrother's home—a pathway that leads from the Villas to a nearby road. He testified that the young men appeared spooked, scared, and sweaty. He asked the young men what was going on and whether someone had been shot. They replied that they did not know and that they were running because they heard gunshots. Mr. Williams testified that he believed it was possible for two young men in good shape to travel on foot from the Meadows to his godbrother's home in 10 to 15 minutes.

Investigator David Burton testified that he assisted in the investigation of the murders and interviewed Dance and Williams in the days following the shootings. Based on information the Milan Police Department received regarding the Defendant's and the Co-Defendant's involvement in the shootings, Investigator Burton compiled a photographic array using photographs from the Milan High School yearbook. Three days after the shootings, Investigator Burton presented the array to Michael Williams, who went through each photo one-by-one before choosing the photos of the Defendant and the Co-Defendant and signing them. Investigator Burton asked Mr. Williams if the individuals pictured in the photos were those who he had seen on the night of the shootings, and Mr. Williams responded in the affirmative. Mr. Williams told Investigator Burton that he knew one of the subjects and recognized the other from the street. However, Mr. Williams did not indicate which individual he knew. Although Mr. Williams changed his tune at the transfer hearing and testified that 'it was dark" and he was unsure whether the Defendant and the Co-Defendant were the individuals he saw, Investigator Burton testified that Mr. Williams was positive about the identification at the time he was presented with the photo array. And while Mr. Williams stated that he had not been threatened for testifying against the Defendant, Investigator Burton testified that Williams previously indicated to him that he had concerns for his safety over testifying.

Investigator Jason Williams, who responded to the scene minutes after the shooting and conducted the majority of the Defendant's interrogation, was last to testify at the transfer hearing. Investigator Williams testified that each victim was shot four times but that law enforcement recovered only three 10-millimeter shell casings from the crime scene. Comparing the number of bullet wounds to the number of recovered shell casings, Investigator Williams theorized that two firearms had been used in the shootings, one being a revolver that did not eject spent shell casings, and the other being some kind of pistol. He testified that he did not see any weapons at the crime scene.

After hearing an offer of proof from the State regarding the circumstances surrounding the Defendant's interrogation, the juvenile court granted the Defendant's motion to suppress and did not consider the Defendant's statements for purposes of the transfer decision. At the close of the hearing, the juvenile court found that (1) both juveniles were seventeen at the time of the alleged murders; (2) both juveniles were provided with

timely notice of the hearing; and (3) there were reasonable grounds[5] to believe each juvenile committed two counts of first-degree murder as alleged in the petition, that they were not committable to a mental health facility, and that the interests of the community required they be legally restrained or disciplined. See Tenn. Code Ann. § 37-1-134(a)(4) (2017).

In determining whether transfer was appropriate, the juvenile court considered the statutory transfer factors.[6] The juvenile court acknowledged that the Defendant had no prior criminal record or past treatment and that there was no evidence presented of the murders "involving gangs," but found that the offense was against two persons, "was a violent offense[,]" "done in a premeditated manner[,]" and was "an aggressive crime." Emphasizing the "nature of the charge that [the Defendant and the Co-Defendant were] facing and their age," the court concluded that it did not have "any procedures, services or facilities that could adequately address rehabilitation with these juveniles." Based on the totality of all the transfer factors, particularly factors three, four, and five, the juvenile court found it appropriate to transfer the Defendant and the Co-Defendant to the trial court to be prosecuted as adults.

*Trial Court Proceedings*

Following transfer, a Gibson County Grand Jury indicted each juvenile on two counts of premeditated first-degree murder In May 2018, Defendant moved to suppress his incriminating statements, arguing that "the circumstances surrounding his interrogation

---

[5] The terms "reasonable grounds" and "probable cause" "ha[ve] been used interchangeably" in the juvenile transfer analysis. State v. Reed, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, *6 (Tenn. Crim. App. Aug. 31, 2010). The language of the transfer statute has changed over time; the General Assembly originally used the term "reasonable grounds" to describe the standard of proof required under Tennessee Code Annotated section 37-1-134(a)(4) but later replaced "reasonable grounds" with "probable cause". Compare Tenn. Code Ann. § 37-1-134(a)(4) (2016) with Tenn. Code Ann. § 37-1-134(a)(4) (2017). For ease of reference, this opinion uses "probable cause" when discussing Tennessee Code Annotated section 37-1-134(a)(4), which aligns with the statutory language at the time of the offenses.

[6] At the time of the alleged offenses, these included:

(1) The extent and nature of the child's prior delinquency records;
(2) The nature of past treatment efforts and the nature of the child's response thereto;
(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(4) Whether the offense was committed in an aggressive and premeditated manner;
(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
(6) Whether the child's conduct would be a criminal gang offense, as defined in section 40-35-121, if committed by an adult.

Tenn. Code Ann. § 37-1-134(b)(1)–(6) (2017).

were in violation of the Fifth and Sixth Amendments of the United States Constitution, Article I, section IX of the Tennessee Constitution, and *Miranda v. Arizona*, 384 U.S. 436 (1966)." The State responded in opposition.

In December 2018, the trial court held a suppression hearing during which it reviewed *in camera* the body camera footage from the Defendant's encounter with law enforcement at his home and the first hour of the recording of the Defendant's interrogation.[7] Thereafter, the trial court denied the Defendant's motion to suppress, finding in its order denying relief

> that the Defendant was seventeen (17) years old at the time of the interview and the Court was impressed from a viewing of the interview with the intelligence of the Defendant and it was clear the Defendant understood *Miranda* warnings and the consequences of waiving the rights set forth in the warnings; and, no proof was presented regarding the extent of the Defendant's education and there was no indication of intoxication or drug influence or retardation; and, the Defendant's parents were not present in the room during the interview but their absence does not render the confession involuntary; and, the interrogation was only one (1) hour in duration such that the Defendant did not appear to be fatigued or beaten down; and, despite the fact that the investigator informed the Defendant at the beginning of the interview that he could possibly be facing the death penalty.

The trial court concluded that based on all the circumstances present at the Defendant's home and the police station, the Defendant's incriminating statements were voluntary and admissible at trial.

The case proceeded to a jury trial.[8] At trial, portions of the Defendant's interrogation were admitted into evidence, including his confession to shooting the victims. Tennessee Bureau of Investigation Special Agent Kyle Osborne, an expert in gunshot residue, determined that there was gunshot residue on pants police obtained from the Defendant's bedroom in the days after the shootings. Agent Osborne testified that the presence of gunshot residue indicated that the person wearing the pants fired a gun, was near a gun

---

[7] The almost seven-hour recording of the Defendant's interrogation is split into seven parts. Because the parties agreed that the remainder of the video was not relevant to the issues raised in the Defendant's suppression motion, the trial court reviewed only the first portion of the recording at the suppression hearing. Specifically, the court reviewed footage from approximately 2:20 a.m. to 3:20 a.m., during which the Defendant was interviewed by Detective Glenn and Investigator Williams. All seven video files, as well as the body camera footage from the Defendant's encounter with police at his home, are in the record. We have meticulously reviewed them all in full.

[8] Although the Defendant and the Co-Defendant were transferred together, they were tried separately.

when it was fired, or came into contact with a gun soon after it was fired. The trial court also heard testimony from Tennessee Bureau of Investigation Special Agent Kasia Lynch. Special Agent Lynch confirmed Investigator Williams's theory that two firearms had been used in the shootings, specifically, a revolver and a pistol. The State also introduced evidence of the Defendant's cell phone records placing him at the Meadows at the time of the shooting. The remaining proof at trial was consistent with the testimony at the juvenile transfer hearing.

The jury ultimately convicted the Defendant of two counts of the lesser included offense of second-degree murder. Pursuant to an agreement made between the State and the Defendant whereby the Defendant would testify against the Co-Defendant, the trial court imposed an effective sentence of twenty years of imprisonment.

*Appellate Proceedings*

The Defendant appealed. See Adkisson, 2024 WL 1252173. The Court of Criminal Appeals affirmed. Id. at *1. The majority found that the juvenile court acted within its discretion in transferring the Defendant to the trial court, reasoning that it "considered the statutory factors [in Tennessee Code Annotated section 37-1-134] and made appropriate findings, which are supported by the record, in determining whether transfer was appropriate." Id. at *6. As is relevant to this appeal, the majority found that the evidence at the transfer hearing supported the juvenile court's finding of "reasonable grounds to believe the defendant committed the offense." Id.

The majority further found no error in the trial court's denial of the Defendant's suppression motion. Id. at *9. At the outset, the majority concluded that *Miranda* warnings were not necessary in this case because the Defendant "was not under arrest or in custody at the time he spoke with officers and ultimately confessed." Notwithstanding this determination, the majority considered the factors for juvenile waiver set forth in State v. Callahan, 979 S.W.2d 577 (Tenn. 1998), and determined that they weighed in favor of valid waiver. Id. at *6–7. The majority next considered the factors for voluntariness set forth in State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013), and concluded that, "under the totality of the circumstances, it is clear the defendant's statement to law enforcement was voluntary and was not a product of coercion." Id. at *7–9.

Judge Camille McMullen dissented, concluding that the juvenile court erred in transferring the Defendant to the trial court and the trial court improperly denied the Defendant's motion to suppress. Id. at *9 (McMullen, P.J., dissenting). On the suppression issue, the dissent disagreed with the majority's "*sua sponte*" determination that *Miranda* warnings were unnecessary, noting that "neither party disputes that the Defendant was in custody [for *Miranda* purposes] at the time of his statement" and that no colorable argument could be made to the contrary. Id. at *15. After summarizing in detail the evidence presented at the transfer hearing, the dissent disagreed with several of the majority's factual characterizations; particularly, that the Chief of Police "corrected"

- 13 -

Investigator Williams' legal misstatement regarding the death penalty, that the interrogation was "one hour in duration," and that the Defendant "provided a significant portion of the statement in question and implicated himself in the murder after only one hour." Id. at *16, *18. In the dissent's view, the totality of the circumstances in light of the Callahan and Climer factors indicated that the Defendant's *Miranda* waiver was invalid and his confession was involuntary. Id. at *18.

The Defendant sought permission to appeal to this Court.[9] In this appeal, the Defendant maintains that the juvenile court lacked probable cause to transfer the case to the trial court. The Defendant further contends that the trial court erred in denying his motion to suppress on the grounds that his incriminating statements to police were elicited in violation of his constitutional right to remain silent under the Fifth Amendment and his due process rights under the Fourteenth Amendment.

## II. ANALYSIS

### A. Juvenile Transfer

We first address whether the juvenile court properly found probable cause under Tennessee Code Annotated section 37-1-134(a)(4)(A) (2017)[10] to transfer the Defendant to the trial court. A juvenile court has exclusive jurisdiction over children who are alleged to be delinquent. Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing State v. Hale, 833 S.W.2d 65, 66 (Tenn. 1992)). Tennessee's juvenile transfer statute provides that after a delinquency petition has been filed, the juvenile court "may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." Tenn. Code Ann. § 37-1-134(a) (2017). The transfer statute further provides that "[t]he disposition of the child shall be as if the child were an adult if:" (1) as applied to this case, the child was at least sixteen years old at the time of the offense, (2) a hearing was held in conformity with the transfer statute, (3) the notice requirements were met, and (4) the juvenile court finds probable cause to believe that:

(A)    The child committed the delinquent act as alleged;

---

9   The Defendant's application for permission to appeal stated the issues as:

   I.    Did Juvenile Court lack probable cause to bind the case over to the Circuit Court?
  II.    Did the Circuit Court err in not suppressing Defendant's statement?
 III.    Is the standard of review of a juvenile court bindover order, as it relates to the probable cause clause in T.C.A. section 37-1-134(a)(4)(A) (probable cause to believe the child committed the delinquent act) de novo as suggested by the dissent or abuse of discretion as used by the majority[?]

10 We apply the version of the transfer statute in effect at the time of the alleged offenses.

(B)     The child is not committable to an institution for the developmentally disabled or mentally ill; and

(C)     The interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a)(1)–(4) (2017).[11]

The transfer statute also requires a juvenile court to consider certain factors in determining whether transfer is appropriate, including:

(1) The extent and nature of the child's prior delinquency records;
(2) The nature of past treatment efforts and the nature of the child's response thereto;
(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(4) Whether the offense was committed in an aggressive and premeditated manner;
(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
(6) Whether the child's conduct would be a criminal gang offense, as defined in section 40-35-121, if committed by an adult.

Id. at 134(b) (2017).[12] These factors are by no means exclusive. State v. Wilson, No. W2003-02394-CCA-R3CD, 2004 WL 2533834, *2 (Tenn. Crim. App. Nov. 8, 2004).

The first issue presented here concerns the probable cause determination required by Tennessee Code Annotated section 37-1-134(a)(4)(A)—whether probable cause exists to believe a juvenile defendant committed the delinquent act as alleged—and the standard by which an appellate court reviews that determination.[13] The Defendant contends that the Court of Criminal Appeals erred by reviewing the probable cause determination required

---

[11] We note that the State contends that subsections (a) and (b) of the transfer statute are mandatory and discretionary provisions, respectively. Specifically, the State avers that a juvenile court may transfer a juvenile under subsection (b), the discretionary transfer provision, without making the probable cause determination required by subsection (a), the mandatory transfer provision. As explained in further detail below, we conclude that the juvenile court met all the criteria for transfer under Tennessee Code Annotated section 37-1-134 and did not abuse its discretion in transferring the Defendant to the trial court.

[12] In 2022, our General Assembly amended subsection (b) to add a seventh factor: "Whether the child has a history of trauma or abuse, including, but not limited to, the child being a victim of a human trafficking offense as defined in § 39-13-314." Tenn. Code Ann. § 37-1-134(b)(7).

[13] Because the Defendant takes no issue with the juvenile court's determinations under subsections (a)(4)(B) and (C), we focus on the juvenile court's probable cause determination under subsection (a)(4)(A) and the standard of review applicable to that determination.

by subsection (a)(4)(A) under an abuse of discretion standard. He argues that the determination under subsection (a)(4)(A) instead warrants de novo review. The State advocates the application of an abuse of discretion standard to an appellate court's entire review of a juvenile court's transfer decision, including its subsidiary finding of whether probable cause exists to satisfy subsection (a)(4)(A).

We traditionally have upheld a juvenile court's decision to transfer a juvenile absent abuse of discretion. See Howell, 185 S.W.3d at 329; see also State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975) (finding that a juvenile court is afforded "a wide range of discretion" in determining whether to transfer a juvenile to be prosecuted as an adult). The standard of review applicable to the specific probable cause determination required by Tennessee Code Annotated section 37-1-134(a)(4)(A), however, is an issue of first impression for this Court.[14]

In arguing for de novo review, the Defendant relies principally on Ornelas v. United States, 517 U.S. 690 (1996), a decision of the Supreme Court of the United States. In Ornelas, the Supreme Court "granted certiorari to resolve . . . the applicable standard of appellate review" of probable-cause findings to stop or search. 517 U.S. at 695. The Court explained that the probable-cause question in the Fourth Amendment context involves two "principal components[.]" Id. at 696. "The first part of the analysis involves only a determination of historical facts[.]" Id. Appellate courts must afford "due weight to inferences drawn from those facts" by law enforcement officers, as well as to the trial court's findings regarding the credibility of the officers and the reasonableness of their inferences. Id. at 699. The second part of the analysis involves applying the historical facts to the law and determining whether the facts, viewed from the standpoint of an objectively reasonable officer, amount to reasonable suspicion or to probable cause. Id. at 697. As the Supreme Court explained, this second consideration is a mixed question of law and fact which appellate courts must review de novo and without deference. Id. at 696. The Court reasoned that "[i]ndependent review is [ ] necessary if appellate courts are to maintain control of, and to clarify, the *legal* principles" of probable cause. Id. at 697 (emphasis added).

In State v. Bell, we cited Ornelas for the proposition that the determination of probable cause to arrest "is a mixed question of law and fact that we review de novo." 429 S.W.3d 524 (Tenn. 2014) at 529 (first citing Ornelas, 517 U.S. at 696–98; and then citing State v. Davis, 354 S.W.3d 718, 726 (Tenn. 2011)). Since Bell, we have consistently

_____

[14] Tennessee's intermediate appellate courts appear to have reviewed this determination under conflicting standards. Compare State v. Orange, 543 S.W.2d 344, 346–47 (Tenn. Ct. App. 1976) (reviewing the record de novo and finding it "contain[ed] sufficient proof of probable cause to believe that [the defendant] committed the delinquent act alleged"), with State v. Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, *38 (Tenn. Crim. App. Jan 16, 2015), perm. app. denied (Tenn. May 14, 2015), abrogated on other grounds by State v. Booker, 656 S.W.3d 49 (Tenn. 2022) ("A juvenile court's findings in determining whether reasonable grounds exist to establish the criteria in subsection (a)(4) are reviewed for an abuse of discretion.").

applied de novo review to determinations of probable cause across a variety of contexts. See, e.g., Reynolds, 504 S.W.3d at 298 (citing Bell and applying de novo review to the question of whether probable cause exists to search); State v. Green, 697 S.W.3d 634, 640 (Tenn. 2024) ("Whether law enforcement possessed probable cause to search a vehicle pursuant to the automobile exception 'is a mixed question of law and fact that we review de novo.'" (quoting Bell, 429 S.W.3d at 529)).

We conclude that the determination of probable cause for purposes of juvenile transfer under Tennessee Code Annotated section 37-1-134(a)(4)(A) should be no different. As in the Fourth Amendment context, whether probable cause exists to transfer a juvenile defendant under subsection (a)(4)(A) requires a two-step analysis. First, the juvenile court must establish the historical facts leading up to the alleged offense. Second, considering the elements of the crime in light of the established facts, the juvenile court must determine whether probable cause exists to believe the juvenile committed the alleged offense. We defer to the juvenile court's determination regarding the historical facts but review the juvenile court's probable cause determination—a mixed question of law and fact—de novo. See Aaron v. Aaron, 909 S.W.2d 408, 410 (Tenn. 1995) ("[T]his Court has great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal.").

We clarify today that an appellate court should review de novo the subsidiary determination of whether probable cause exists to believe a juvenile committed the alleged delinquent act under Tennessee Code Annotated section 37-1-134(a)(4)(A).[15] The juvenile court's ultimate transfer decision, however, will not be reversed on appeal absent an abuse of discretion. See Howell, 185 S.W.3d at 329.

With this standard of review in mind, we address whether the evidence at the transfer hearing established probable cause to believe the Defendant committed two counts of premeditated first-degree murder. The Defendant contends that the evidence at the transfer hearing was insufficient to justify such a finding. The State, on the other hand, avers that the proof at the transfer hearing sufficed to establish probable cause.

As Judge McMullen's dissent correctly noted, "[p]robable cause in the context of juvenile transfer hearings is not statutorily defined." Adkisson, 2024 WL 1252173, at *9 (McMullen, P.J., dissenting). However, prior case law indicates that "'[t]he substance of

---

[15] The few appellate decisions from other jurisdictions addressing this issue also have found that de novo review applies. See Commonwealth v. Irvin I., 173 N.E.3d 415, 420 (Mass. App. Ct. 2021) (noting that de novo review applies to the determination of probable cause that a juvenile defendant committed the delinquent act); In re A.J.S., 897 N.E.2d 629, 638 (Ohio 2008) ("[A] juvenile court's probable-cause determination in a mandatory-bindover proceeding involves questions of both fact and law, and thus, we defer to the trial court's determinations regarding witness credibility, but we review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged.").

all the definitions' of probable cause 'is a reasonable ground for belief of guilt.'" <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949) (quoting <u>McCarthy v. De Armit</u>, 99 Pa. 63, 69 (1881)). The determination of probable cause is "highly fact-dependent[.]" <u>Bell</u>, 429 S.W.3d at 529. "The strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." <u>State v. Bishop</u>, 431 S.W.3d 22, 41 (Tenn. 2014). It requires "more than mere suspicion" but need not rise to the level of "absolute certainty." <u>State v. Melson</u>, 638 S.W.2d 342, 350 (Tenn. 1982). The circumstances must demonstrate merely a "fair probability" that a crime has been committed. <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Here, the Defendant was indicted on two counts of premeditated first-degree murder. The offense is defined as the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (2017). A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim. Tenn. Code Ann. § 39-11-302(a) (2017). A premeditated act refers to an act done after the exercise of reflection and judgment. Tenn. Code Ann. § 39-13-202(d) (2017). However, "no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan[.]" <u>State v. Brown</u>, 836 S.W.2d 530, 543 (Tenn. 1992)) (<u>superseded on other grounds by statute as recognized in State v. Harrell</u>, No. E2005-01531-CCA-R3-CD, 2007 WL 595885 (Tenn. Crim. App. Feb. 26, 2007), <u>perm. app. denied</u>, (Tenn. June 25, 2007).

As our Court of Criminal appeals has observed, "[p]roof of premeditation is inherently circumstantial." <u>State v. Gann</u>, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). "The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." <u>Id.</u> Circumstances which may give rise to an inference of premeditation include, *inter alia*:

> (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; and (8) a defendant's failure to render aid to a victim.

<u>McKinney</u>, 669 S.W.3d at 773. "The existence of premeditation is a question of fact to be determined by considering all of the evidence." <u>State v. Reynolds</u>, 635 S.W.3d 893, 916 (Tenn. 2021) (first citing <u>State v. Clayton</u>, 535 S.W.3d 829, 845 (Tenn. 2017); and then citing <u>State v. Dickson</u>, 413 S.W.3d 735, 746 (Tenn. 2013)).

Although the question of proof of premeditation in this case is a close one, upon reviewing the record de novo, we have determined that the evidence adduced by the State

at the transfer hearing was sufficient to support the juvenile court's finding of probable cause that the Defendant committed premeditated first-degree murder.

First, testimony at the transfer hearing indicated that the Defendant procured a weapon after arriving at the Meadows. See State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997) ("Evidence of procurement of a weapon is probative to prove premeditation.") (citation omitted). Witness Quavion Lipscomb testified that, as he was driving the Defendant and the Co-Defendant to the Meadows on the night of the shootings, he saw a silver gun in the waistband of the Co-Defendant's shorts, which were sagging and appeared "unusually heavy." The Defendant's pants, on the other hand, were not sagging, and Lipscomb did not see the Defendant with a gun. Shortly after they arrived at the Meadows, the Co-Defendant and the Defendant walked past witness J'Lon Dance, victim Dearrious Young, and two others. Dance testified that the Co-Defendant lifted up his shirt to show "something silver" in his shorts that Dance thought was a gun. Dance testified that he did not see the Defendant with a gun. Although the Defendant was not seen with a gun prior to and immediately after arriving at the Meadows, Investigator Williams testified that ballistics evidence from the crime scene indicated that two weapons were used in the shootings.

Second, premeditation can be inferred based on evidence that the Defendant and the Co-Defendant used deadly weapons against unarmed victims. See McKinney, 669 S.W.3d at 773 (finding that use of a deadly weapon against an unarmed individual may be considered when inferring premeditation). Officer Huddleston testified at the transfer hearing that he did not observe any weapons on or near the victims' bodies when he arrived at the scene minutes after the shootings. Investigator Williams corroborated this testimony, confirming no weapons were recovered from the crime scene.

Third, Investigator Williams testified that each victim was shot four times. See State v. Davidson, 509 S.W.3d 156, 199 (Tenn. 2016) ("The manner in which the killing was committed, such as 'repeated shots, blows, and other acts of violence' may constitute sufficient evidence of premeditation.") (quoting State v. Banks, 564 S.W.2d 947, 950 (Tenn. 1978)). The victims' multiple gunshot wounds also demonstrate the intentional nature of the murders. See, e.g., Reynolds, 635 S.W.3d at 917 (relying on evidence of multiple gunshot wounds to establish intent for premeditated first-degree murder).

Fourth, and finally, the Defendant's and the Co-Defendant's failure to render aid to the victims provides some evidence of premeditation. Officer Huddleston testified at the transfer hearing that the people he saw surrounding the victims' bodies when he pulled up to the crime scene were gone by the time he exited his patrol car and approached the bodies. J'Lon Dance further testified that he did not see anyone standing around the victims' bodies when he ran out of his apartment moments after the shooting.

Additionally, "[t]he identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d

789, 793 (Tenn. 1975)). With regard to identity, there was testimony from Michael Williams that supported identification of the Defendant. Mr. Williams testified that, ten to fifteen minutes after the shootings, he saw two young men speed-walking through the woods between the Meadows and his godbrother's home. Mr. Williams described the young men as appearing "spooked" and "scared" and remarked that it was possible for two young men in reasonably good shape to traverse the distance between the Meadows and his godbrother's home in ten to fifteen minutes. Mr. Williams agreed that three days after the shootings, he picked the Defendant's and the Co-Defendant's photographs out of an array and signed them. While he testified at the transfer hearing that he was unsure whether the Defendant and the Co-Defendant were the young men he saw, Investigator Burton testified that Mr. Williams was certain of the identification at the time and that he had indicated he knew one of the individuals. Investigator Burton further testified that Mr. Williams had expressed fear of retaliation for testifying against the Defendant.

While the evidence at the transfer hearing supporting the juvenile court's finding of probable cause may not have been overwhelming without the Defendant's statement, "the strength of the evidence necessary to establish probable cause [ ] is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." Bishop, 431 S.W.3d at 41. Accordingly, we conclude that the testimony at the transfer hearing was sufficient to establish probable cause that the Defendant committed two counts of premeditated first-degree murder.

Because all the criteria for transfer under Tennessee Code Annotated section 37-1-134 were satisfied in this case,[16] we hold that the juvenile court did not abuse its discretion in transferring the Defendant to the trial court to be prosecuted as an adult.

*B. Admissibility of the Defendant's Confession*

Having found that the Defendant's transfer was appropriate, we next consider whether the trial court properly denied the Defendant's motion to suppress and admitted his incriminating statements at trial.

An appellate court is bound by the trial court's factual findings regarding a motion to suppress unless the evidence preponderates otherwise. Davidson, 509 S.W.3d at 182. Questions as to the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "However, when the trial court's findings of fact at a suppression hearing are based solely on evidence not requiring credibility determinations, 'the rationale underlying a more deferential standard of review

---

[16] As noted previously, the juvenile court found that the Defendant was seventeen years of age at the time of the alleged killings, that he was provided with timely notice of the transfer hearing, and that probable cause existed to believe he was not committable to a mental institution and the community interests required he be placed under legal restraint. The juvenile court also considered the six statutory transfer factors and made findings as to each factor.

is not implicated.'" Climer, 400 S.W.3d at 556 (quoting State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000)). Such factual findings are reviewed de novo on appeal. Id. (citation omitted).

Whether a defendant has validly waived the right to remain silent and voluntarily confessed are questions of fact. State v. Willis, 496 S.W.3d 653, 695 (Tenn. 2016); State v. Clark, 452 S.W.3d 268, 282 (Tenn. 2014). Because the trial court's factual determinations at the suppression hearing were based entirely on video evidence included in the record, we review the trial court's findings of fact de novo. See Climer, 400 S.W.3d at 556. We likewise review the trial court's application of the law to the facts de novo with no presumption of correctness. Davidson, 509 S.W.3d at 187.

This issue implicates the federal and state privilege against self-incrimination. The Fifth Amendment to the United States Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution likewise prohibits compulsory self-incrimination. Tenn. Const. art. I, § 9.

### i. Miranda Warnings

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court adopted a set of prophylactic measures designed to safeguard the constitutional right against compelled self-incrimination and dispel the coercive pressures inherent in custodial interrogations. Pursuant to *Miranda*, a suspect subjected to custodial interrogation must be apprised by law enforcement

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any interrogation if he so desires.

Miranda, 384 U.S. at 479.

A defendant may waive the rights protected by Miranda provided he does so voluntarily, knowingly, and intelligently. State v. Blackstock, 19 S.W.3d 200, 206 (Tenn. 2000). Absent a knowing and voluntary waiver, a defendant's testimonial statements made during a custodial interrogation are inadmissible as substantive evidence in the prosecution's case-in-chief. Climer, 400 S.W.3d at 564. Waiver notwithstanding, due process principles require that a suspect's statements to police be voluntary. Statements obtained as a result of physical or psychological coercion are inadmissible for any purpose. McKinney, 669 S.W.3d at 767. The prosecution carries the burden of establishing both waiver and voluntariness by a preponderance of the evidence. Climer, 400 S.W.3d at 564; Clark, 452 S.W.3d at 282.

We have recognized on several occasions that *Miranda* waiver and due process voluntariness are distinct inquiries. <u>McKinney</u>, 669 S.W.3d at 765–67; <u>Davidson</u>, 509 S.W.3d at 189; <u>Climer</u>, 400 S.W.3d at 568. "The issue under *Miranda* is whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, whereas the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." <u>Davidson</u>, 509 S.W.3d at 189 (first citing <u>State v. Freeland</u>, 451 S.W.3d 791, 815 (Tenn. 2014); and then citing <u>State v. Smith</u>, 933 S.W.2d 450, 455 (Tenn. 1996)). These issues carry different evidentiary ramifications, require separate analyses, and should not be conflated. <u>McKinney</u>, 669 S.W.3d at 765. Accordingly, we will conduct the *Miranda* waiver and due process voluntariness inquiries separately and in turn. See <u>Id.</u> at 767–68 (opting to conduct the *Miranda* inquiry first given that "many of the same facts that are pertinent to the *Miranda*-waiver inquiry are also pertinent to the due process voluntariness inquiry discussed later in the opinion").

*ii. Waiver*

The Defendant contends that his *Miranda* waiver was not knowing and voluntary because he lacked the experience and intelligence to understand the implications of waiving his rights and his waiver was conditioned upon the presence of his mother in the interrogation room. The State retorts that the circumstances surrounding the Defendant's *Miranda* waiver weigh in favor of a valid waiver.

As noted above, a *Miranda* waiver will not be considered valid unless it is knowing, intelligent, and voluntary. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). The waiver must be "voluntary" in the sense that it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and "knowing" in that it is made "with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> Taken together, the totality of the circumstances must reveal a willing choice and an adequate level of understanding. <u>Id.</u>

When the defendant is a juvenile, Tennessee courts consider characteristics pertinent to juveniles in evaluating whether the defendant validly waived his or her *Miranda* rights. <u>State v. Callahan</u>, 979 S.W.2d 577, 583 (Tenn. 1998). The so-called "Callahan factors" include:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
> (4) any intoxication;
> (5) any mental disease, disorder, or retardation; and
> (6) the presence of a parent, guardian, or interested adult.

Id. "While courts shall exercise special care in scrutinizing a juvenile suspect's waiver, no single factor . . . should by itself render a confession unconstitutional absent coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

The Defendant in this case was advised of his *Miranda* rights two times—first at his home, and second at the police station. Neither party disputes that the Defendant was in custody for *Miranda* purposes when Investigator Williams read the Defendant the *Miranda* warnings at the police station. Thus, we assume for purposes of this appeal that Investigator Williams was required to recite the *Miranda* warnings, and there is no question that Investigator Williams effectively and adequately did so. The pivotal question is whether the Defendant validly waived the exercise of his right to remain silent.

Answering this question requires us to consider the Callahan factors in light of the relevant facts in the record, beginning with the Defendant's "age, education, and intelligence." At the time of the police interrogation, the Defendant was roughly eight months shy of turning eighteen and was in the twelfth grade. He was a senior in high school and school and had no intellectual disabilities. He appeared articulate and intelligent during the interrogation. The Defendant's age, education, and intelligence weigh in favor of a valid waiver. Both parties agree that the Defendant did not have a prior record, which weighs against valid waiver. See McKinney, 669 S.W.3d at 769.

The circumstances surrounding the interrogation and waiver reveal that police first contacted the Defendant at his home with his mother standing nearby. The Defendant's mother underscored the Defendant's right to silence by advising him that he need not speak to police. After Sergeant Fountain fully informed the Defendant of his *Miranda* rights, the Defendant implicitly indicated that he understood them. The Defendant answered a question posed by Investigator Williams and willingly accompanied law enforcement officers to the police station to speak with them further. A short time after they arrived at the station, Investigator Williams asked the Defendant if he would like to go over his rights again. The Defendant declined, but Investigator Williams nevertheless advised the Defendant of his *Miranda* rights for a second time. The Defendant proceeded to speak to Investigator Williams. He was able to read and write in the language used to convey his *Miranda* rights and does not contend that he was intoxicated or suffering from any mental impairment at the time of the *Miranda* waiver. These circumstances favor a valid waiver.

It is undisputed that the Defendant's mother was not present in the interrogation room when the Defendant was advised of his *Miranda* rights for a second time. While this circumstance certainly weighs against a valid *Miranda* waiver, we disagree with the Defendant's contention that the absence of his mother from the interrogation room automatically invalidates his waiver. See State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999) ("[T]he admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation.") (citing State v. King, No. 02C01-9509-CR-00280, 1997 WL 41256, at *3–4 (Tenn. Crim. App. Feb. 4, 1997)). As we have explained, the validity of a waiver is evaluated based on all of the circumstances present at the time

of the waiver. See Callahan, 979 S.W.2d at 583. The absence of the Defendant's mother from the interrogation room, while indeed disturbing given the Defendants' multiple requests for his mother's presence, is not determinative.

With respect to the "knowing" prong of the waiver inquiry, we conclude that the Defendant understood that he had a right to remain silent and what the consequences of abandoning that right would be. The Defendant appeared intelligent, had a twelfth-grade education, and was twice advised by law enforcement of the right to remain silent. Nevertheless, he answered investigator's questions. See Berghuis v. Thompkins, 560 U.S. 370, 385 (2010) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.") (citations omitted).

Turning to the "voluntary" prong, we find no evidence that the Defendant's *Miranda* waiver was extracted by improper police coercion. The Defendant agreed to accompany investigators to the police station after officers made it abundantly clear that he was not under arrest. After arriving at the station, the Defendant was in the interrogation room for a short amount of time—approximately twenty minutes—before investigators again advised him of his *Miranda* rights. Investigators maintained a calm and polite demeanor up to that point.

The Defendant and amici curiae contend that the Defendant's waiver was invalid because it was not explicit.[17] In the context of adult *Miranda* waivers, this Court has held that "implicit waivers are valid" if "the suspect received and understood *Miranda* warnings, did not invoke *Miranda* rights, and gave an uncoerced statement to the police." Climer, 400 S.W.3d at 565 (citations omitted). In the juvenile context, the Tennessee Court of Criminal Appeals has held that "waiver may be inferred from the facts of the case[,] and [] proof of an affirmative statement by a defendant to that effect is not essential." Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975). We agree and hold that, for juvenile and adult defendants alike, an implicit *Miranda* waiver is valid if the prosecution shows the suspect received and understood the rights set forth in the *Miranda* warnings, chose to

---

[17] Amici curiae urges this Court to adopt a per se rule that all implicit juvenile waivers are invalid. We decline to do so and conclude that the validity of a *Miranda* waiver by a juvenile defendant, whether implicit or explicit, should be determined based on the totality of the circumstances. See Fare v. Michael C., 442 U.S. 707, 725 (1979) ("[The] totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved."); see also Hardaway v. Young, 302 F.3d 757, 764 (7th Cir. 2002) (declining to impose a per se rule that "no child under the age of 16 may . . . make a voluntary confession without a parent or guardian present" because the Fare decision "makes quite clear that all juvenile confessions are to be assessed under the totality of the circumstances standard, and that no one factor will be dispositive") (citation omitted).

relinquish them, and was not coerced to do so. See Climer, 400 S.W.3d at 565. As discussed above, these requirements have been satisfied in the present case.

Based on the totality of the circumstances surrounding the Defendant's *Miranda* waiver, we conclude that the Defendant was properly advised of his right to remain silent and understood the right. We further conclude that the Defendant knowingly and voluntarily relinquished the right.

### *iii. Voluntariness*

The Defendant next contends that his statements were extracted by interrogation methods violative of due process, including, but not limited to, "threats that he would face the death penalty if he did not cooperate and that he would be forced to take lie detector and gunshot residue tests." He also cites his age, the length and time of the interrogation, and police officers' refusal to allow him to consult with his mother despite her presence at the police station as factors affecting the voluntary nature of his confession. The State, for its part, contends that the circumstances surrounding the Defendant's confession show that it was voluntary and not the product of coercion.

The use of an involuntary confession as evidence in a criminal prosecution is prohibited by the United States Constitution under the Self-Incrimination Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. See U.S. Const. amend. V (prohibiting states from compelling a defendant in a criminal case "to be a witness against himself"); see also Lisenba v. California, 314 U.S. 219, 236–37 (1941) (holding that the use of a coerced confession to obtain a guilty verdict constitutes a denial of due process under the Fourteenth Amendment). Introduction of an involuntary confession at trial likewise is prohibited by the Tennessee Constitution under Article I, section 9. Tenn. Const. art. I, § 9 (providing that a criminal defendant "shall not be compelled to give evidence against himself"). The State bears the burden of proving voluntariness by a preponderance of the evidence. Climer, 400 S.W.3d at 564.

Whether a confession is voluntary hinges on "'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined[.]'" State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)); see also Bram v. United States, 168 U.S. 532, 542–43 (1897) (finding a confession to be inadmissible if "extracted by any sort of threats or violence, []or obtained by any direct or implied promises, however slight, []or by the exertion of any improper influence").

In conducting the voluntariness inquiry, courts examine the totality of the circumstances surrounding a suspect's confession, considering "both the characteristics of the accused and the details of the interrogation." Climer, 400 S.W.3d at 568 (citations omitted). Relevant factors include:

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the interrogation; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Id. (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)) ("the Climer factors"). In making this determination, we are mindful that confessions and admissions by juveniles require special caution. See e.g., In re Gault, 387 U.S. 1, 45 (1967); Haley v. Ohio, 332 U.S. 596, 599 (1948); Gallegos v. Colorado, 370 U.S. 49, 53 (1962).

We begin by considering the facts that we recounted in the previous section involving the Defendant's personal characteristics. McKinney, 669 S.W.3d at 767 ("[M]any of the factors for determining whether a statement was voluntary are similar to the factors for determining whether a juvenile waived his or her *Miranda* rights."). At the time of the statement, the Defendant was approximately eight months shy of turning eighteen, was a senior in high school, and had no intellectual disabilities. He appeared articulate and engaged during the questioning and gave no indication that he could not understand the officers. here was also no evidence that he was under the influence of any substance, such as alcohol or drugs, during the interview. The Defendant's age, education, lucidity, and sobriety during the interrogation support a finding of voluntariness. It is undisputed that the Defendant had no prior experience with the criminal justice system. This fact cuts against voluntariness.

The interrogation occurred entirely in the absence of the Defendant's mother although she was physically present at the police station, the Defendant expressed a desire to speak with her on four separate occasions, and law enforcement repeatedly indicated that he would be allowed to have his mother present in the near future. This never happened. This factor weighs heavily against voluntariness.

At 4:05 a.m., law enforcement offered the Defendant food, which he declined, though he accepted water. Food was provided at 8:08 a.m., but the Defendant did not eat. Unsurprisingly, the Defendant was unable to sleep at all during lengthy breaks from questioning. Video footage of the detention shows him yawning, stretching, and adjusting his position in an apparent attempt to get comfortable. As the night progressed, the Defendant exhibited signs of emotional distress, crying intermittently during breaks in questioning and, at one point, repeatedly striking his head on the table in front of him.

Shortly after the interrogation began, Investigator Williams inexplicably told the Defendant that he was "looking at possibly the death penalty." Investigator Williams then intimated to the Defendant that he could possibly assist him in obtaining a more lenient sentence if he cooperated, stating, "if you'll be honest with me, I'll try to help you all I can[.]" Moreover, he told the Defendant that he had a video of the shooting incriminating him when no such video existed.

When the Chief of Police, Chief Sellers ("the Chief"), entered the interrogation room, the Chief told the Defendant that he was "just as guilty" as the Co-Defendant because he was with him at the time of the shooting. The Chief insinuated that a jury would not believe the Defendant was there but did not know the Co-Defendant was going to shoot, asking "you think twelve men and women in a jury box are gonna believe that?"

The Chief himself also told the Defendant that he would be imprisoned in the state penitentiary and warned the Defendant that he "d[idn]'t think [he] want[ed] to know" what adult prisoners "do to seventeen-year-olds in the [penitentiary]."[18] The Defendant then told the Chief that Investigator Williams told him he could be facing the death penalty. Rather than correct the misstatement, the Chief remarked, "I don't know about that. We don't know about that."[19] While speaking to the seated Defendant, the Chief stood over him, leaning forward with both hands planted on the table in front of him. The Defendant later mentioned the Chief's statements to Investigator Williams, noting that the Chief had told him a jury would likely find him guilty just for being at the scene. The above circumstances weigh strongly against voluntariness.

Having reviewed the evidence in the record pertaining to the death penalty threat in this case, we now address whether that factor alone renders a minor defendant's confession involuntary. The admissibility of a juvenile defendant's confession after a brief reference to the death penalty, as occurred in this case, has not been addressed by a court of this state. Appellate courts in other states have reached differing conclusions when considering whether a brief death penalty reference alone rendered a juvenile defendant's subsequent confession involuntary. Compare State v. Garner, 614 N.W.2d 319, 327–28 (Neb. 2000) (finding minor defendant's statement voluntary despite two brief death penalty references by law enforcement), with Green v. State, 605 A.2d 1001, 1005 (Md. Ct. Spec. App. 1995)

---

[18] The only logical interpretation of this comment is that it was an allusion to prison violence and rape. See Dye v. Commonwealth, 411 S.W.3d 227, 234 (Ky. 2013) (holding that "attempting to persuade a seventeen-year-old that a confession is the only way he will avoid daily prison assault—sexual or otherwise—is 'objectively coercive'") (citing Henson v. Commonwealth, 20 S.W.3d 466, 469 (Ky. 1999)). While we do not agree with the Kentucky courts that such a statement is "objectively coercive," it definitely is a factor that weighs in favor of a finding of involuntariness.

[19] The Court of Criminal Appeals found that the Chief had "corrected" Investigator Williams' threat regarding the death penalty. Adkisson, 2024 WL 1252173, at *2. We disagree that the Chief's comment in any way can be appropriately characterized as correcting Investigator Williams' statement.

(finding minor defendant's statement involuntary where detectives made one brief death penalty reference).

In Garner, a 15-year-old suspected of murdering an elderly woman was interrogated by police in the absence of a parent or guardian from 2:16 a.m. to 5:06 a.m. 614 N.W.2d at 42, 45. Throughout the questioning, investigators employed an interrogation technique whereby they would explain to the defendant how the public would perceive the crime and suggest that this was the defendant's opportunity to reframe the narrative. Id. at 46. During two such instances, investigators told the defendant that when the public learned the details of the murder, they would be "asking for the death penalty" and would "want to stick [him] in the electric chair." Id. The defendant's confession was admitted into evidence at trial over his objection. Id. at 47. On appeal, the Supreme Court of Nebraska held that the two death penalty references did not render the defendant's confession involuntary because they were made "in the context of a continued effort by the officers to illustrate to [the defendant] how the public would view the crime" rather than "in connection with a threat or promise of leniency." Id. at 51. The Garner Court also pointed out that "a considerable amount of time passed between [the officer's] second statement regarding the death penalty and the time when [the defendant] confessed." Id.

Conversely, in Green, the Court of Special Appeals of Maryland held that a detective's false statement to a seventeen-year-old murder suspect that he was facing the death penalty was impermissibly coercive, and thus the minor's subsequent confession was not voluntary. 605 A.2d at 1003, 1005. As in Garner, the minor defendant in Green was interrogated late at night in the absence of his mother. Id. at 1003. Unlike in Garner, however, the detective in Green directly told the defendant that he could be facing the death penalty. Id. Specifically, the detective told the defendant he could "get . . . the electric chair" if he did not "tell [the officer] what happened." Id. The defendant confessed shortly thereafter. Id. In considering the voluntariness of the confession under the totality of the circumstances, the Green Court found it "difficult to conceive of any other purpose to [the investigating officer's] actions in mentioning a possible death penalty to appellant other than to coerce him into cooperating[,]" and held that "incorrectly advising a minor that he may be subject to the death penalty constitutes 'improper influence' to the extent that the minor's free will is overcome." Id. at 1005.

While the officers in Garner referenced the death penalty while discussing how the public would likely perceive the offense, Investigator Williams did not reference the death penalty to illustrate public perception of the crime. Rather, like the detective in Green—who told a juvenile defendant that he could face the death penalty if he failed to explain what occurred—Investigator Williams advised the Defendant that he could be facing the death penalty and implied that, if he was truthful, he might be able to assist the Defendant in securing a more lenient sentence.

The State contends, and the partial dissent agrees, that the approximately five-hour interval between the erroneous death-penalty threat and the Defendant's subsequent

confession dissipated any coercive impact. We respectfully disagree. As the partial dissent correctly observes, the death penalty was referenced on two occasions during the nearly seven-hour detention: first at 2:42 a.m., when Investigator Williams wrongly stated that the Defendant could be "looking at possibly the death penalty," and again at 3:25 a.m., when the Defendant repeated that statement to the Chief of Police. The Defendant's subsequent mention of the death penalty to the Chief supports the inference that the threat remained on his mind and continued to exert influence on the Defendant. Moreover, it defies logic to suggest that the threat of the death penalty would not continue to weigh heavily on a juvenile defendant for four more hours, particularly when he was left alone for most of that time. See Hardaway v. Young, 302 F.3d 757, 766 (7th Cir. 2002) (acknowledging that leaving a juvenile alone in an interrogation room for a prolonged period could "create[] enough psychological pressure to render the confession involuntary" because "adolescents are less mature than adults" and such time lapses that adults might weather could "render involuntary the confession of a child, especially one deprived of any adult assistance").[20] Nonetheless, we conclude that the death penalty threat, in and of itself, does not render the Defendant's confession involuntary. It simply factors into the totality of the circumstances analysis.

The partial dissent focuses on the Defendant initiating conversations with the investigators at approximately 7:00 a.m. and again approximately 90 minutes later. This focus essentially compartmentalizes the statements as opposed to considering them in the totality of the circumstances. Furthermore, it ignores multiple factors directly relevant to the overall context in this case. The conversation heavily relied upon by the partial dissent occurred over 5 hours after the detectives first went to the Defendant's home and asked him to come to the station to answer questions after promising his mother that she could be present during the questioning; after he requested to speak with his mother on at least four separate occasions and was promised multiple times that he could soon speak with her; after his mother's repeated requests and continued presence at the station; after being threatened with the death penalty; after being falsely told that an incriminating video existed; after being left in solitude for multiple long periods of time; after having it not-so-subtly inferred to him that he would be subjected to violence and rape in prison; after not being able to sleep; after not being able to eat; after literally banging his head against the table; and after being denied a towel or blanket when he complained of being cold.

In summary, with respect to the totality of the circumstances in this case, the Defendant was roughly eight months shy of turning eighteen, a senior in high school, and appeared intelligent. However, he had no prior experience with the criminal justice system, was held incommunicado for approximately seven hours in the middle of the night, and

---

[20] The partial dissent claims that the fact that the investigators actually only questioned the Defendant for roughly two of the seven hours he was detained militates in favor of voluntariness. We disagree with the partial dissent and agree with the Hardaway court that the long periods during with the Defendant was left alone during the interrogation in this case can also be psychologically intimidating.

steadily denied any involvement in the shooting for roughly six hours. He was also repeatedly denied access to his mother during the detention despite his repeated pleas to speak to her, her presence at the station, and police assurances that she could be present.[21] As the detention progressed, the Defendant showed signs of sleep deprivation and emotional distress, at one point repeatedly hitting his head on the table in front of him. He further endured an investigator falsely telling him that police had video evidence concretely proving his guilt and that he could face the death penalty if he did not cooperate and was later told by the Chief of Police that a jury would not believe him innocent even if he did not commit the crime and implied that he would inevitably be sent to adult prison where he would face violence and rape at the hands of adult prisoners.

Accordingly, based on the review of the relevant Climer factors[22] and the totality of the circumstances surrounding the Defendant's interrogation, we conclude that the Defendant's statements were involuntary.[23] Therefore, we hold that the trial court erred in denying the Defendant's motion to suppress and admitting the Defendant's statements at trial.[24] The Defendant's convictions of second-degree murder are vacated, and this case is remanded to the trial court for further proceedings consistent with this opinion. Specifically, if the State decides to retry the Defendant, the Defendant's confession shall not be admissible at trial.

### III. CONCLUSION

We affirm the trial court's judgment in part and reverse in part. We conclude that the Defendant properly was transferred to be tried as an adult in the trial court. Likewise, we conclude that the Defendant waived his Miranda rights. However, we conclude that the Defendant's confession was not voluntary based upon the totality of the circumstances in

---

[21] Although the exclusion of the Defendant's mother from the interrogation room is not dispositive on its own, it is a significant factor supporting a finding that the confession was involuntary.

[22] Several of the Climer factors are not present here. Namely, the record contains no evidence of "unnecessary delay in bringing [the Defendant] before a magistrate before he gave the confession;" that the Defendant was "injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement;" or that the Defendant was "physically abused." 400 S.W.3d at 568 (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).

[23] The partial dissent claims that we have conflated best practices with constitutional requirements. We respectfully disagree. Quite to the contrary, this case does not involve simply a lack of best police practices. This case constitutes a clear constitutional violation which this Court must not countenance.

[24] We note that, during proceedings before the Court of Criminal Appeals, the State argued that any error in admitting the Defendant's confession at trial was harmless error. The State did not make any such argument in this Court. Therefore, we need not address this argument.

this case. Accordingly, we vacate the Defendant's convictions of second-degree murder and remand to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE